# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 17, 2012 Session

## STATE OF TENNESSEE v. GEORGE ANDREW STANHOPE

**Appeal from the Circuit Court for Hickman County**
**No. 06-5132 CR     Timothy L. Easter, Judge**

---

**No. M2011-00272-CCA-R3-CD - Filed September 12, 2013**

---

The Defendant, George Andrew Stanhope, was indicted for first degree premeditated murder, three counts of first degree felony murder, theft of property valued at $1,000 or more but less than $10,000, aggravated burglary, and aggravated rape. See Tenn. Code Ann. §§ 39-13-202, -13-502, -14-103, -14-105(a)(3), -14-403. Following a jury trial, the Defendant was convicted of first degree premeditated murder, two counts of first degree felony murder, theft of property valued at $1,000 or more but less than $10,000, and aggravated burglary. The jury acquitted the Defendant of the charge of aggravated rape and one count of first degree felony murder. The trial court merged the two first degree felony murder convictions with the first degree premeditated murder conviction. The jury imposed a sentence of life without the possibility of parole for the first degree premeditated murder conviction. The trial court held a sentencing hearing on the remaining convictions and imposed a sentence of six years for the aggravated burglary conviction and a sentence of four years for the theft conviction. The trial court ordered the sentences to be served consecutive to each other and to the sentence for the first degree premeditated murder conviction, for an effective sentence of life without the possibility of parole plus ten years. In this appeal as of right, the Defendant contends (1) that the trial court erred in denying the Defendant's motion to suppress statements he made to the police; (2) that the trial court erred by not allowing defense counsel to review the personnel file of a former police detective; (3) that the in-court security around the Defendant was excessive and gave the jury the impression that he was in custody; (4) that the evidence was insufficient to sustain the Defendant's convictions; (5) that the trial court erred by not merging the Defendant's convictions for theft and aggravated burglary; (6) that the statutory aggravating circumstance of the victim's age was unconstitutional; (7) that a new trial was warranted because one of the jurors failed to disclose her relationship with the court clerk during voir dire; and (8) that the Defendant was entitled to a new trial due to cumulative error.[1] Discerning no error, we affirm the judgments of the trial court.

---

[1] For the purposes of clarity and brevity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Gary W. Wicks, Sr., and Robert L. Booker, Franklin, Tennessee, for the appellant, George Andrew Stanhope.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; Michael Joseph Fahey, II, and Kate Yeager, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Guilt Phase*

The victim, Lillie Moran, was last seen alive on the afternoon of April 5, 2006. Sammy Ferguson testified at trial that he leased a cow pasture adjacent to the ninety-year-old victim's house in a "secluded area" of Hickman County. On April 5, 2006, Mr. Ferguson spoke to the victim in her driveway around 3:00 p.m. when she returned home from a physical therapy appointment. The victim's neighbor, David Oxman,[2] had driven the victim to the appointment in her car, a tan 1998 Ford Escort station wagon. The victim had a follow-up appointment scheduled with the physical therapist for the next day, but the victim never showed up for the appointment and did not answer her phone when the physical therapist's office called to remind her of the appointment.

At approximately 3:00 p.m. on April 6, 2006, Deputy Levi Mobley of the Hickman County Sheriff's Department (HCSD) responded to "a possible death" call at the victim's home. Deputy Mobley testified that he met Mr. Oxman on a side deck of the house near the carport. According to Deputy Mobley, the victim's car was not in the carport and Mr. Oxman was "somewhat" upset. The victim used a side entrance as the main entrance to her home instead of the front door. Deputy Mobley testified that there were pry marks on the screen door and that it "had been apparently forced open." The inside handle of the screen door was broken off and found lying on a washing machine inside the home. A crow bar from the victim's tool shed was found on a bench in the carport. The victim's phone line had

---

[2]Mr. Oxman died prior to the Defendant's trial.

been cut and two small plug-in lights the victim kept on her porch were found in the yard "a fairly good distance from the house."

Deputy Mobley testified that he entered the house with another deputy and found the victim in a first floor bedroom. The victim was lying on the bed and "had trauma to the right side of her head." The victim was clothed and "covered up" to her chest with a sheet. The victim's hands were crossed and resting on her torso. A bloody pillow was propped up on the headboard next to the victim's head. A purse and a nightgown were found lying on the bed next to the victim's body. The victim's bed appeared to have been pushed over "about a foot" and several coins were scattered across the bedroom floor. An empty "coin sorter" was found on the victim's nightstand. Deputy Mobley checked the victim for a pulse and determined that she was dead. Deputy Mobley testified that he did not touch anything else in the bedroom besides the victim's neck and arm.

The evidence at trial established that the Defendant's grandmother lived on a hill 200 yards from the victim's house. Sometime between 2:00 and 3:00 a.m. on the morning of April 6, 2006, the Defendant pulled into a local gas station driving the victim's car. Tristan Louis Malston testified that he was working at the gas station that morning when the Defendant came in alone. Mr. Malston testified that the Defendant was very quiet that morning. Christopher M. Campbell testified that he was working at the Waffle House in Dickson that morning when the Defendant came into the restaurant by himself around 3:00 a.m.[3] The Defendant left and came back to the restaurant around 7:00 a.m. driving the victim's car. Mr. Campbell testified that he did not have a ride home, so he accepted a ride with the Defendant. Mr. Campbell further testified that he spent the entire day with the Defendant in Nashville and Dickson and that the Defendant had a revolver with him.

The Defendant's ex-girlfriend, Leandra Smith-Winters, testified that she saw the Defendant at 6:15 a.m. on April 6, 2006, as she was dropping her son off at daycare. According to Ms. Smith-Winters, the Defendant was alone and was driving the victim's station wagon. The Defendant gave Ms. Smith-Winters a ring that morning. According to Ms. Smith-Winters, the Defendant had not had a job since January 2006. The victim's niece, Dorothy L. King, identified the ring the Defendant gave to Ms. Smith-Winters as having belonged to the victim. Ms. King also testified that the victim's station wagon was valued at $3,500 in April 2006. Ms. Smith-Winters testified that she saw the Defendant two more times that day. The Defendant was still driving the victim's car, but Mr. Campbell was with him when she saw him later on in the day.

---

[3]Two witnesses testified that Mr. Campbell "clocked in" around 9:00 p.m. on April 5, 2006, and worked until 6:15 a.m. on April 6, 2006.

At approximately 10:30 p.m. on April 6, 2006, Sergeant Jeff Lovell of the Dickson County Sheriff's Department (DCSD) spotted the victim's car pull up to a pay phone at Tuffy's Market. As the Defendant got out of the car to use the pay phone, Sgt. Lovell drew his weapon and ordered the Defendant to lie down on the ground. Sgt. Lovell ordered Mr. Campbell to exit the car and lie down on the ground as well. Deputy Paul Montgomery of the DCSD handcuffed the Defendant and checked his driver's license to confirm his identity. Deputy Montgomery then placed the Defendant in the backseat of his cruiser and activated the cruiser's audio recording device. At trial, the audio recording was played for the jury. The Defendant told Deputy Montgomery, without any prompting, to "look under the front seat" when he searched the car because there was "a .32 revolver under there." While the Defendant was alone in the cruiser, he stated that he wanted the police to take him to jail so he could call Ms. Smith-Winters and tell her he had been "arrested for murder."

The Defendant was eventually moved from Deputy Montgomery's cruiser to a HCSD cruiser that did not have an audio recording device. Once in the HCSD cruiser, the Defendant started "causing a little bit of a commotion" and motioning for officers to come to the cruiser. Sgt. Carl Hutchinson of the HCSD testified that when he approached the cruiser, the Defendant said that he knew "what this [was] all about . . . [h]omicide." Sgt. Hutchinson went and got Jimmy Barnett, then a detective with the HCSD, to come speak with the Defendant. Mr. Barnett testified that the Defendant repeatedly told him that he knew "what this [was] about." Mr. Barnett eventually asked the Defendant, "what" it was all about, and the Defendant responded "homicide." The Defendant then pointed at Mr. Campbell and said that Mr. Campbell "didn't have anything to do with it."

Mr. Barnett testified that the Defendant stated that he had left his grandmother's house the night before and had gone to the victim's house. The Defendant told Mr. Barnett that he cut the victim's phone line with a knife and then knocked on her door to ask if he could use the phone. The victim answered the door and invited the Defendant inside. The Defendant told Mr. Barnett that the victim was holding a gun when she answered the door. The Defendant asked for a glass of water and sat down in the living room. Eventually, the victim put her gun down on a table. The Defendant told Mr. Barnett that he picked up the gun, and made the victim go into her bedroom and lie down on the bed. The Defendant stated that he put a pillow over the victim's head and shot her twice in the head.

Sgt. Hutchinson testified that he heard most of what the Defendant said to Mr. Barnett and corroborated Mr. Barnett's recollection of the Defendant's statements. Sgt. Hutchinson also testified that the Defendant said, "I probably f--ked up, didn't I" after he told Mr. Barnett that he shot the victim. All of the officers involved in the Defendant's arrest who testified at trial stated that they did not tell the Defendant why he was being arrested and did not hear anyone else tell the Defendant he had been arrested for a homicide. Mr. Campbell

-4-

testified that he repeatedly asked the officers why he was being detained, but none of the officers responded to his questions. However, Mr. Campbell testified that he could not hear what the officers said to the Defendant. Later that night, samples were taken from the Defendant's hands to test for gun shot residue, and the Defendant gave the police his clothes for forensic testing. The next day, the Defendant told Mr. Barnett that he did not know why he killed the victim because she was the only person that was ever nice to him.

A Smith & Wesson .32 long caliber revolver was recovered under the driver's seat of the victim's car after the Defendant's arrest. Constable Jerry Deal testified that the gun recovered from the victim's car belonged to the victim and that she kept it in her nightstand for protection. Shelly Betts, a forensic scientist with the Tennessee Bureau of Investigation (TBI) and an expert in tool mark and firearms identification, testified that .32 caliber guns were relatively uncommon and "not a very popular revolver." When the revolver was recovered, it had four unfired Winchester .32 caliber cartridges in the cylinder and two empty chambers. Ms. Betts testified that the recovered cartridges contained "copper coated brown nose lead bullets." Police recovered a fired bullet underneath the victim's body when it was moved from the bed. A second fired bullet was found during the victim's autopsy in the sheet her body had been wrapped in.

Ms. Betts testified that the pillow found above the victim's head had two bullet holes in it. Ms. Betts opined that both shots were "contact or near contact gunshots." Ms. Betts also testified that the fired bullets were .32 caliber, "copper coated lead with a round nose." Ms. Betts opined that the fired bullets were "the same type and design" as the bullets found in the unfired cartridges found in the revolver. Ms. Betts also opined that the fired bullets were "consistent with being manufactured by Winchester," like the unfired cartridges. The fired bullets were too badly damaged for Ms. Betts to make a conclusive determination as to whether they had been fired from the victim's gun. However, there were no dissimilarities between the bullets recovered at the crime scene and bullets test-fired from the gun. Ms. Betts testified that both of the fired bullets had the same "class characteristics" and one bullet had "similar individual characteristics" with the test-fired bullets.

Ms. Betts also testified about the cut to the victim's phone line and the pry marks on the victim's screen door. Ms. Betts opined that the cut to the phone line had been made with a single-blade cutting tool like a knife or a box cutter. Ms. Betts testified that there were pry marks both below and above the handle to the screen door. Ms. Betts opined that the pry marks on the door were made by "a prying type tool" like the crowbar found in the victim's carport. Ms. Betts also opined that the marks were the same size as the crowbar, but she testified that "there were not individual characteristics to link the crowbar to the tool marks on the door." TBI agents searched the victim's house for fingerprints but were unable to find any identifiable prints in this case.

Laura Hodge, a TBI forensic scientist and expert in gunshot residue, testified that the samples taken from the Defendant's hands were inconclusive for gunshot residue. Ms. Hodge explained that to determine if gunshot residue was present she looked for three specific chemical elements in specific quantities. Ms. Hodge testified that all three of the elements were present in the samples from the Defendant's hands, especially his left palm, but not in sufficient quantities to say the Defendant tested positive for gunshot residue. Ms. Hodge further testified that gunshot residue was "very fragile" and could easily be destroyed by wiping or washing the affected area. No gunshot residue was found on the Defendant's clothing. However, three bloodstains were found on the Defendant's jeans. Two of the stains were a "complete" match with the victim's DNA and the third stain was a partial match.

Doctor Adele Lewis, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. Dr. Lewis determined that the cause of the victim's death was two gunshot wounds to the right side of the victim's face. One bullet exited the victim's skull on the left side of her head and the other through her left ear. The victim had a skin tear and bruising on her left arm as well as bruising on her right arm. There was also some bruising on the victim's legs. Dr. Lewis opined that these injuries could have occurred near the time of the victim's death. Dr. Lewis also opined that the injures were consistent with someone forcefully grabbing the victim. Dr. Lewis noted that the victim had no underwear on when her body was found. There was a tear on the victim's vagina and bruising nearby, which Dr. Lewis opined indicated direct trauma to the area. A rape kit was prepared and sent to the TBI for examination. However, there was no sperm found on the swabs submitted with the rape kit.

David Brundage testified on behalf of the Defendant as an expert in tool mark and firearms identification. Mr. Brundage opined that the pry marks on the screen door were made by a rounded tool and were inconsistent with the crowbar found in the victim's carport. Mr. Brundage also opined that he "could not positively identify nor eliminate" the fired bullets recovered from the victim's bed as having been fired from the gun found under the driver's seat of the victim's car.

Based upon the foregoing evidence, the jury convicted the Defendant of first degree premeditated murder, two counts of first degree felony murder, theft of property valued at $1,000 or more but less than $10,000, and aggravated burglary. The jury acquitted the Defendant of the charge of aggravated rape and the related count of first degree felony murder.

## II. Penalty Phase

The State introduced into evidence the victim's death certificate to establish that she was born in 1915 and ninty-years-old at the time of her death. The victim's niece read a prepared victim's impact statement to the jury. The Defendant presented testimony from a clinical neuropsychologist and a psychiatrist. These witnesses testified that the Defendant had a below average IQ; had been abused by his mother, grandmother, and uncles as a child; had been repeatedly placed into foster care; and had suffered a catastrophic head injury when he was seventeen. They also testified that the Defendant had abused alcohol since he was nine and claimed to have been intoxicated on alcohol and cocaine when he killed the victim. These witnesses opined that the Defendant had suffered a personality change due to his head injury and had become more aggressive and disinhibited since the injury. The State presented a psychiatrist and a clinical psychologist as rebuttal witnesses. The State's witnesses opined that the Defendant had impulse control problems before his accident and that his behavior was the same before and after the accident. The jury ultimately sentenced the Defendant to life without the possibility of parole.

## ANALYSIS

### I. Suppression Motion

The Defendant contends that the trial court erred by denying his motion to suppress his statements to the police. The Defendant argues that on the night of his arrest he was interrogated by former detective Jimmy Barnett without having been properly informed of his Miranda rights. The Defendant also argues that he was interrogated by Mr. Barnett the day after his arrest without having waived his Sixth Amendment right to counsel. The Defendant further argues that the police illegally seized his clothing and took samples for a gunshot residue test because they asked for his consent after he invoked his right against self-incrimination. The State responds that the Defendant's statements on the night of his arrest were voluntary, were not the product of interrogation, and, furthermore, that Mr. Barnett informed the Defendant of his Miranda rights prior to his confession. The State also responds that the Defendant knowingly and intelligently waived his Sixth Amendment right to counsel when the Defendant spoke to Mr. Barnett the day after his arrest. The State further responds that the Defendant's arguments regarding the seizure of his clothing and gunshot residue samples are without merit.

At a pre-trial suppression hearing, Mr. Barnett testified that on the night of the Defendant's arrest, he could hear the Defendant "hollering, wanting to talk" from an HCSD cruiser. Mr. Barnett testified that Sgt. Hutchinson called him over to the cruiser and said that the Defendant was "wanting to talk to" Mr. Barnett. According to Mr. Barnett, he opened

the door to the cruiser and the Defendant repeatedly said, "You know what this is all about." Mr. Barnett told the Defendant that he wanted to wait until they got back to the police station to talk to the Defendant about his arrest. Mr. Barnett testified that the Defendant continued to say, "You know what this is all about." Mr. Barnett finally asked the Defendant what it was all about, and the Defendant responded, "Homicide."

Mr. Barnett testified that once the Defendant said "homicide," he advised the Defendant of his Miranda rights. According to Mr. Barnett, he recited the Miranda warnings to the Defendant from memory. Mr. Barnett also testified that he had previously advised the Defendant of his Miranda rights on "at least ten or fifteen" different occasions prior to the Defendant's arrest on April 6, 2006. Mr. Barnett asked the Defendant if he understood his rights, and the Defendant responded that he understood his "f--king rights." Mr. Barnett testified that the Defendant then confessed to killing the victim. Mr. Barnett also testified that he did not ask the Defendant any questions and that the Defendant "just continued to talk." Sgt. Hutchinson testified that he overheard Mr. Barnett advise the Defendant of his Miranda rights and portions of the Defendant's confession.

Once the Defendant finished his confession, Mr. Barnett asked the Defendant if he would give a recorded statement at the police station. Mr. Barnett testified that the Defendant agreed to give another statement at the police station. According to Mr. Barnett, once the Defendant had been transported to the police station he consented to give TBI Agent Mike Cox his clothes and to have a gunshot residue test performed on his hands. Mr. Barnett testified that after those items had been collected, the Defendant "commenced to cussing" and became "very upset." The Defendant then refused to speak with Mr. Barnett and stated that he would not tell the police officers anything else. Mr. Barnett testified that he made no further attempt to question the Defendant.

The next day the Defendant was arraigned and appointed an attorney to represent him. After the arraignment, Mr. Barnett was told that the Defendant "was worrying the jailers to death wanting to talk to [him]." Mr. Barnett testified that he went to the jail and told the Defendant that he could not talk to him because he had been appointed an attorney. According to Mr. Barnett, the Defendant told him he "just want[ed] to talk" and that the police already had the victim's car and that his fingerprints would be on the gun. Mr. Barnett testified that he again advised the Defendant of his Miranda rights and that he did not have to speak with Mr. Barnett without his attorney present. The Defendant "cussed again" and said that he did not need an attorney. The Defendant then told Mr. Barnett that he did not know why he killed the victim. Mr. Barnett testified that he did not ask the Defendant any questions while he was at the jail.

Based upon the foregoing evidence, the trial court denied the Defendant's suppression motion. The trial court concluded that the Defendant's confession on the night of his arrest was voluntary and not the product of police interrogation. The trial court further concluded that even if Mr. Barnett's actions amount to an interrogation, the Defendant had been properly advised of his Miranda rights and waived those rights prior to his confession. With respect to the Defendant's saying he did not know why he killed the victim, the trial court concluded that the Defendant initiated the contact with Mr. Barnett and that Mr. Barnett's actions did not violate the Defendant's Sixth Amendment right to counsel. The Defendant's statements to Mr. Barnett on the night of his arrest and his statement that he did not know why he killed the victim were admitted at trial. The test results from the gunshot residue test on the Defendant's hands and the forensic examination of the Defendant's clothing were also admitted at trial.

*A. Standard of Review*

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

*B. Statements on the Night of the Defendant's Arrest*

A defendant's statements "made during the course of custodial police interrogation are inadmissible as evidence in a criminal case unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights." State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The Miranda decision mandates that police inform a person being questioned of the following rights prior to a custodial interrogation:

[T]hat (a) he has the right to remain silent; (b) any statement made may be used against him; (c) he has the right to the presence of an attorney; and (d) if

he cannot afford an attorney, one will be appointed for him prior to questioning, if he so desires.

Id.

"An officer is not required to give a verbatim recitation of the <u>Miranda</u> warnings to avoid the pollution of voluntary statements made by an accused during questioning." <u>State v. Chambless</u>, 682 S.W.2d 227, 232 (Tenn. Crim. App. 1984) (citing <u>California v. Prysock</u>, 435 U.S. 355 (1981)). <u>Miranda</u> warnings must be provided "to an accused when the accused is in custody and is subjected to interrogation or its functional equivalent." <u>State v. Sawyer</u>, 156 S.W.3d 531, 534 (Tenn. 2005) (citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 298 (1980)). However, "where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant." <u>State v. Land</u>, 34 S.W.3d 516, 525 (Tenn. Crim. App. 2000); <u>see also Miranda</u>, 384 U.S. at 478 (holding that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today").

Here, the Defendant made a "commotion" until Sgt. Hutchinson approached him. The Defendant told Sgt. Hutchinson that he knew "what this [was] all about . . . [h]omicide." At that point, Sgt. Hutchinson got Mr. Barnett. Mr. Barnett testified that he told the Defendant that he wanted to wait and take his statement at the police station. However, the Defendant repeatedly stated, "You know what this is all about," until Mr. Barnett finally responded by asking him what it was about. The Defendant repeated his statement that "this [was] all about . . . homicide." The Defendant's statements to Mr. Barnett and Sgt. Hutchinson that he knew "what this [was] all about . . . [h]omicide" were voluntary and not the product of interrogation or its functional equivalent.

Mr. Barnett then stopped the Defendant and informed him of his <u>Miranda</u> rights. Sgt. Hutchinson testified that he overheard Mr. Barnett provide the <u>Miranda</u> warnings to the Defendant. Additionally, Mr. Barnett testified that he had previously advised the Defendant of his <u>Miranda</u> rights ten or fifteen times. The Defendant told Mr. Barnett that he understood his "f--king rights" and proceeded to confess to the victim's murder. There is no evidence that the <u>Miranda</u> warnings Mr. Barnett provided to the Defendant that night were deficient. Having been properly advised of his <u>Miranda</u> rights, the Defendant then waived those rights and confessed to killing the victim. Accordingly, we conclude that the trial court did not err in denying the Defendant's motion to suppress with respect to his statements made on the night of his arrest.

## C. Statements Made After Arraignment

The Sixth Amendment provides that the accused in a criminal prosecution "shall enjoy" the right to the assistance of counsel. This right attaches at the time the State initiates adversarial judicial proceedings against a defendant. State v. Rollins, 188 S.W.3d 553, 565-66 (Tenn. 2006). Once the right has attached, a defendant "has [the] right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401 (1977). However, the Defendant may waive this right so long as the waiver is made knowingly and intelligently. Patterson v. Illinois, 487 U.S. 285, 291 (1988). "So long as the accused is made aware of the 'dangers and disadvantages of self-representation' during post-indictment questioning, by use of the Miranda warnings, his wavier of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" Id. at 300. Furthermore, as previously stated, "where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant." Land, 34 S.W.3d at 525.

After counsel was appointed for the Defendant, he repeatedly requested to speak with Mr. Barnett to the point that he "was worrying the jailers to death wanting to talk to [Mr. Barnett]." Once at the jail, Mr. Barnett warned the Defendant that he should not speak to him without his attorney present and advised the Defendant of his Miranda rights again. The Defendant stated that he did not need an attorney because he "just want[ed] to talk." The evidence clearly demonstrates that the Defendant initiated the contact with Mr. Barnett, that he was aware of the "dangers and disadvantages" of speaking to Mr. Barnett alone, and that he knowingly and intelligently waived his right to speak with Mr. Barnett with counsel present. Accordingly, we conclude that the trial court did not err in denying the Defendant's suppression motion with respect to his statements made after his arraignment.

## D. Consent to Provide Clothes and Gunshot Residue Samples

The Defendant contends that the police officers could not ask for his consent to provide samples from his hands for a gunshot residue test and to provide his clothing because he had invoked his right against self-incrimination and refused to speak with the police. However, the Defendant failed to include this issue in his suppression motion or object at trial to the admission of the test results from the gunshot residue test on his hands and the forensic examination of his clothing. Instead, the Defendant first raised this issue in his motion for a new trial. A motion to suppress evidence must be filed prior to trial. Tenn. R. Crim. P. 12(b)(2)(C). Failure to do so results in a waiver of the issue. Tenn. R. Crim. P. 12(f)(1); State v. Burtis, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983). As such, the Defendant has waived this issue.

*II. Police Personnel Records*

The Defendant contends that the trial court erred by not allowing his counsel to review the personnel file of a former police detective. Prior to trial, Mr. Barnett was terminated from his position as a detective with the HCSD. The Defendant subsequently filed a motion requesting that the State produce Mr. Barnett's personnel file as possible impeachment evidence. The file was submitted to the trial court for in camera review, and the trial court determined that the file contained no exculpatory or impeachment evidence relevant to this case. On appeal, the Defendant argues that his defense counsel should have been allowed to inspect the file rather than relying on the judgment of the trial court. The State responds that the trial court followed the proper procedure and did not err by refusing the Defendant's request to have the file inspected by his counsel.

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, "a defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files." Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). Contrary to the Defendant's argument in this appeal, "[d]efense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." Id.

This court, after reviewing the applicable sections of the Tennessee Rules of Criminal Procedure, prior Tennessee case law, and case law from other jurisdictions, has adopted the following rule:

> Criminal defendants may not routinely have access to police personnel records, but upon a strong showing that the personnel records might contain information material to a defendant's case, the trial court should conduct an in camera inspection of the records and release to [the] defendant those items the court deems material to the defense.

State v. Butts, 640 S.W.2d 37, 39 (Tenn. Crim. App. 1982) (emphasis added). The trial court properly followed this procedure as laid out in the Butts opinion. We are not inclined to alter this long standing rule to now provide defendants with unfettered access to police personnel records.

Furthermore, the Defendant failed to request that Mr. Barnett's file be placed under seal and preserved for our review. As such, the Defendant has waived review by this court

-12-

as to whether the file contained any relevant information.  See State v. Bryan Herman Dowdy, No. W2000-01011-CCA-R3-CD, 2001 WL 91732, at *8 (Tenn. Crim. App. Jan. 26, 2001).  Accordingly, we conclude that the trial court did not err by denying the Defendant's request to have his counsel inspect Mr. Barnett's personnel file.

*III. In-Court Security*

The Defendant contends that the in-court security around him was excessive and gave the jury the impression that he was in custody.  The Defendant argues that the trial court erred in denying his motion for a mistrial after several jurors allegedly saw the Defendant being transported from the courtroom to the local jail.  The Defendant further argues that the number of bailiffs in the courtroom was excessive and that they "congregated" around the Defendant during the trial.  The State responds that the Defendant failed to establish a manifest necessity warranting a mistrial.  The State further responds that the security around the Defendant was not excessive and that the trial court took curative measures each time the Defendant complained about the security in the courtroom.

During a break in the trial, the Defendant requested a mistrial because three jurors saw the Defendant as he was being transported back to the jail for lunch.  Defense counsel stated that the Defendant had not been handcuffed but that "it was obvious that he was being taken back to the jail."  Defense counsel stated that the bailiff had stopped to smoke a cigarette which allowed the jurors to see the Defendant.  The trial court denied the Defendant's motion, and defense counsel declined to argue the matter further or have any evidence about the incident placed on the record.

In addition to this, during voir dire, defense counsel complained to the trial court that it had become "a bit of a procession in and out of the courtroom following" the Defendant.  The trial court responded by ordering that only one bailiff stay in the courtroom during the proceedings.  Later in the trial, defense counsel complained that the bailiff was sitting behind the Defendant.  The trial court stated that there was no need for the bailiff to sit directly behind the Defendant and requested that he sit in the back of the courtroom for the remainder of the trial.  At no point did the Defendant request a mistrial based upon his complaints concerning the in-court security.

The determination of whether to grant a mistrial lies within the sound discretion of the trial court and should be granted "only in the event of a 'manifest necessity' that requires such action."  State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix).  The burden of establishing a "manifest necessity" lies with the party seeking the mistrial.  State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).  "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes

-13-

an impartial verdict." Id. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id. Failure to request a mistrial waives any further action by the trial court. Hall, 976 S.W.2d at 157.

This court has previously held that incidental sightings of defendants being transported from the courthouse in handcuffs and prison clothes are not prejudicial. State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). In doing so, this court stated as follows:

> Common sense must prevail in such instances where a jury or jurors inadvertently see a defendant dressed in prison clothing. Reason dictates that they must know a person on trial is either on bail or in confinement during the course of trial. The evidence of the guilt of all the defendants in this case was strong. There is no indication that any of them were prejudiced by the occurrence complained of.

Id. Here, the Defendant offered no proof to support his allegations and admitted that he was not handcuffed at the time the jurors allegedly saw him. As such, the Defendant failed to establish that a manifest necessity required a mistrial. Furthermore, as we will discuss more fully below, the evidence of the Defendant's guilty was overwhelming. Therefore, the Defendant has failed to establish that he was prejudiced by the alleged sighting. Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial.

With respect to the Defendant's claims that the in-court security was excessive, we note that the Defendant did not request a mistrial or that a curative instruction be given to the jury in response to his complaints. As such, the Defendant waived any further action by the trial court on this issue. Furthermore, we do not believe that the trial court erred by failing to sua sponte declare a mistrial as a result of the Defendant's complaints. The trial court responded to each of the Defendant's complaints and limited the security in the courtroom to one bailiff who was eventually instructed to sit in the back of the courtroom. We will not overturn a trial court's decision regarding how to implement courtroom security unless there has been "some abuse of the trial court's discretion in marshaling the trial." State v. Franklin, 714 S.W.2d 252, 258 (Tenn. 1986). We cannot conclude that the trial court's actions constituted such an abuse of discretion nor that the use of one uniformed bailiff who was eventually moved to the back of the courtroom branded the Defendant in the eyes of the jury "with an unmistakable mark of guilt." Holbrook v. Flynn, 475 U.S. 560, 571 (1986). Accordingly, we conclude that this issue is without merit.

-14-

*IV. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his convictions. However, the Defendant has made no argument as to why the evidence was insufficient to sustain his convictions. "Issues which are not supported by argument . . . will be treated as waived in this court." Tenn. Ct. Cr. App. R. 10(b). Waiver not withstanding, we will briefly address the sufficiency of the convicting evidence.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. Dorantes, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting Crawford, 470 S.W.2d at 612) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for

this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the evidence of the Defendant's guilt was overwhelming for all of his convictions. The victim was found lying on her bed, dead from two gunshots to the right side of her head. A bloodied pillow with two bullet holes was found above the victim's head. The phone line to the victim's house had been cut, there were pry marks on her screen door, and her car was missing when police found her body. Prior to the discovery of the victim's body, the Defendant was repeatedly seen driving the victim's car, and he gave his ex-girlfriend a ring that belonged to the victim. Later the Defendant was arrested while driving the victim's car, and a .32 caliber revolver that had belonged to the victim was found under the driver's seat. After his arrest, the Defendant confessed to entering the victim's home under the false pretext of using her phone, taking her gun away from her, and killing her.

The victim's gun had four unfired cartridges and two empty chambers when it was recovered. Forensic testing revealed that the bullets recovered from the crime scene were consistent with being the same type as the unfired cartridges found in the gun. The recovered bullets also had the same class characteristics as bullets test-fired from the victim's gun. The Defendant's pants had three blood stains, two of which were a complete match for the victim's DNA. Testimony from the victim's niece established that the items taken from the victim were valued at more than $1,000. Accordingly, we conclude that the evidence was more than sufficient to sustain the Defendant's convictions for first degree premeditated murder, two counts of first degree felony murder, aggravated burglary, and theft of property valued at $1,000 or more but less than $10,000.

## V. Merger of Aggravated Burglary and Theft Convictions

The Defendant contends that the trial court erred by not merging his conviction for aggravated burglary and theft of property valued at $1,000 or more but less than $10,000. The Defendant argues that the facts giving rise to his theft conviction arose from the same facts leading to his aggravated burglary conviction and that theft was a lesser-included offense of aggravated burglary. The State responds that theft is not a lesser-included offense of aggravated burglary and that the General Assembly intended for theft and aggravated burglary to be punished separately.

Both the United States and Tennessee Constitutions prohibit multiple punishments for the same offense. State v. Thompson, 285 S.W3d 840, 846-47 (Tenn. 2009). A trial court's determination whether "multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." State v. Watkins, 362 S.W.3d 530, 539 (Tenn. 2012) (citing Thompson, 285 S.W.3d at 846)). Our supreme court recently adopted the test found in Blockburger v. United States, 284 U.S. 299 (1932), for use in determining whether convictions for offenses under two different statutes constitute the same offense for double jeopardy purposes. Id. at 556.

The Blockburger test provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. The central analysis of the Blockburger test "requires an examination of the statutory elements [of the offenses] in the abstract, without regard to the proof offered at trial in support of the offenses." Watkins 362 S.W.3d at 544. "If each offense includes an element that the other offense does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Id. (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)) (internal quotation marks omitted).

The first step in the Blockburger test is to determine the threshold question of "whether the convictions arise from the same act or transaction." Watkins, 362 S.W.3d at 556. "If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment." Id. In answering this question, we refer "to the charging instrument and the relevant statutory provisions" and "consider whether the charges arise from discrete acts or involve multiple victims." Id. Here, the offenses occurred against the same victim, at the same location, in close temporal proximity, and as part of one continuing criminal transaction. Therefore, we move to the next step of the Blockburger test.

The second step of the Blockburger test requires us "to examine the statutory elements of the offenses." Watkins, 362 S.W.3d at 557. The following presumptions apply to our examination of the statutory elements of the offenses:

> If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy

purposes, and we will presume that the Legislature intended to permit multiple punishments.

Id. (internal footnote omitted).

Aggravated burglary occurs when a defendant enters into a habitation without the effective consent of the owner with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401, -402, -403. Theft of property occurs when a defendant, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Contrary to the Defendant's argument, our supreme court has previously held that theft is not a lesser included offense of aggravated burglary and that the two offenses are "codified in distinct statutory provisions and are intended to protect different interests." See State v. Davis, 613 S.W.2d 218, 221 (Tenn. 1981).

Aggravated burglary is "an offense against the security interest in possession of property rather than an offense against the legal title or ownership of the property" and is completed when entry has been made into the habitation. State v. Ralph, 6 S.W.3d 251, 255 (Tenn. 1999). Theft, on the other hand, is "an offense against the legal title or ownership of the property" and is not completed "until the defendant obtains or exercises control over the property with the intent to deprive the owner of the property." Id. "Consummation of the intended felony, theft, or assault is not necessary to complete the crime of burglary." Id. As such, "after proving either of these offenses, different and additional facts and elements must be shown to prove the other." Davis, 613 S.W.2d at 221. Accordingly, we conclude that the Defendant's convictions for aggravated burglary and theft do not violate his constitutional protections against double jeopardy.

### VI. Victim's Age as an Aggravating Circumstance

The Defendant contends that the State's use of the statutory aggravating circumstance of the victim's age was unconstitutional. The Defendant argues that he was arbitrarily sentenced because use of the victim's age as an aggravating circumstance required the jury to ignore the mitigating evidence he presented and sentence him to life without the possibility of parole. The State responds that the jury properly followed its instructions regarding the imposition of the sentence and that use of a victim's age as an aggravating factor in sentencing is not constitutionally suspect.

On appeal, we review a sentence of life without the possibility of parole for "any errors assigned" and for "the appropriateness of the sentence." Tenn. Code Ann. § 39-13-207(g). Such a sentence "shall be considered appropriate if the [S]tate proved beyond a

reasonable doubt at least one [] statutory aggravating circumstance . . . and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Id. Here, the State established beyond a reasonable doubt that the victim was seventy years or older at the time of her death. See Tenn. Code Ann. § 39-13-204(i)(14). As such, we examine whether the Defendant's sentence was imposed arbitrarily, "so as to constitute a gross abuse of the jury's discretion."

When the State has established the existence of a statutory aggravating circumstance beyond a reasonable doubt, "the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or to imprisonment for life." Tenn. Code Ann. § 39-13-207(c). A trial court is statutorily mandated to instruct a jury "that, in imposing sentence, it shall weigh and consider the statutory aggravating circumstance or circumstances proven by the [S]tate beyond a reasonable doubt and any mitigating circumstance or circumstances." Tenn. Code Ann. § 39-13-207(d). The jury in this case was so instructed, and jurors are presumed to follow the trial court's instructions. See State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). There is no evidence in the record before us to support the Defendant's argument that the jury sentenced him without considering and weighing the mitigating evidence presented at the sentencing hearing.

No Tennessee court has previously addressed the question of whether use of the victim's age as a statutory aggravating circumstance is constitutional. However, it has previously been held that "there are no constitutional or statutory impediments" to the use of the victim's age as an aggravating circumstance when the victim's age is an element of the convicting offense. See State v. Hodges, 7 S.W.3d 609, 629 (Tenn. Crim. App. 1998). Here, the age of the victim was not an element of the offense and the Defendant has cited to no authority to support his contention that such a factor alone is arbitrary and constitutionally suspect. We believe that a rational basis exists for the General Assembly's determination that the elderly are especially vulnerable and should be protected. It was not unconstitutional for the legislature to conclude that murders against the elderly are more abhorrent than other first-degree murders and should be punished more severely. Accordingly, we conclude that this issue is without merit.

*VII. Juror's Relationship with the Court Clerk*

The Defendant contends that a new trial was warranted because one of the jurors failed to disclose her relationship with the court clerk during voir dire. The Defendant argues that the juror's failure to disclose her relationship denied him the "fair opportunity to use his peremptory challenge[s]," hampered defense counsel in the jury selection process, and significantly impaired his right to a trial by a fair and impartial jury. The State responds that the juror did not give any false or misleading answers during voir dire and that there was no

-19-

evidence of any bias on the juror's part. The State concludes that the Defendant has not established any prejudice due to the juror's failure to disclose her relationship with the court clerk.

During voir dire, defense counsel asked several times whether any of the potential jurors were related "by blood or marriage" to either the Defendant or the victim. Defense counsel also asked the potential jurors if any of them had been the victim of a violent crime or had any "significant experience or interaction with law enforcement." Several potential jurors responded that they had family members involved in law enforcement. Defense counsel then followed up by asking if "[a]nyone else [had] any significant experience with law enforcement, or the District Attorney, or the judicial system?" Later, defense counsel asked if anyone had any "close relatives or close friends who [were] involved in law enforcement?" Juror Tammie Dotson did not respond affirmatively to any of these questions.

After trial, defense counsel learned that Ms. Dotson was the sister-in-law of the court clerk and that they were next-door neighbors. At the hearing on the Defendant's motion for new trial, Ms. Dotson testified that she did not voluntarily disclose her relationship with the court clerk because she did not consider the court clerk to be involved with the trial proceedings and did not think that their relationship had anything to do with her service as a juror. Ms. Dotson further explained that she was never asked if she was related to anyone in the clerk's office. Ms. Dotson testified that she did not have any experience with law enforcement or the judicial system beyond her jury service in this case.

Ms. Dotson further testified that she did not feel that her relationship with the court clerk constituted "significant involvement with the judicial system." Ms. Dotson explained that she believed that being personally involved in a trial or knowing a party in a case would constitute a "significant involvement with the judicial system." Ms. Dotson testified that she had never seen or participated in a trial except for this case and that she did not know anyone who had ever been a party in a trial. Ms. Dotson further testified that she did not have any conversations with the court clerk about this case or her jury service. The court clerk testified that she never discussed pending court matters with friends and family and that she never told Ms. Dotson about the Defendant's case or his criminal history. Based upon the foregoing, the trial court denied the Defendant's motion for a new trial on this issue.

Both the United States and the Tennessee Constitutions guarantee a defendant's right to trial "by an impartial jury." State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993). Our state constitution guarantees every defendant a trial by a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." Id. (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)). In protection of this right, "[t]he essential function of voir dire is to allow for the impaneling of a fair and impartial jury

through questions which permit the intelligent exercise of challenges by counsel." Id. A defendant may challenge a juror's qualifications post-verdict when bias or prejudice is actually shown to exist or can be presumed from the circumstance. Id. at 355 (quoting Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945)). Likewise, a post-verdict challenge may be lodged "when a juror conceals or misrepresents information tending to indicate a lack of impartiality." Id.

The Defendant "bears the burden of providing a prima facie case of bias or partiality." Akins, 867 S.W.2d at 355. "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." Id. However, this presumption of bias "may be dispelled by an absence of actual favor or partiality by the juror." Carruthers v. State, 145 S.W.3d 85, 95 (Tenn. Crim. App. 2003). Furthermore, "[i]nsignificant nondisclosures will not give rise to a presumption of prejudice." Akins, 867 S.W.2d at 356 n.12. A defendant waives his right to object to a juror's failure to volunteer information that "could reasonably be interpreted as extraneous" when he fails to ask "questions calculated to produce specific answers" regarding the information. Clariday v. State, 552 S.W.2d 759, 771 (Tenn. Crim. App. 1976).

This court has previously held that a juror's relationship "to people connected with law enforcement . . . does not give rise to an inherently prejudicial situation in and of itself." State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983). A juror's failure to volunteer information concerning such a relationship "does not establish a prima facie case of bias or partiality." Id. at 700. We see no reason why this rule should not apply with equal force to a juror's relationship with court personnel. Therefore, Ms. Dotson's failure to voluntarily disclose her relationship to the court clerk alone did not give rise to a presumption of prejudice. We must now examine whether Ms. Dotson answered any of defense counsel's questions falsely or withheld requested information during voir dire.

We do not believe that defense counsel's question whether any of the potential jurors had "any significant experience with law enforcement, or the District Attorney, or the judicial system" was calculated to produce specific answers about Ms. Dotson's relationship with the court clerk. Ms. Dotson testified at the motion for new trial hearing that she believed "significant experience" with the judicial system meant having been involved in a trial or knowing someone who was a party to a trial. Ms. Dotson further testified that she had no personal experience with law enforcement or the judicial system beyond her service as a juror in this case. We believe that this is the most reasonable interpretation of defense counsel's question and that Ms. Dotson did not willfully withhold requested information during voir dire.

Furthermore, Ms. Dotson's testimony at the motion for new trial hearing established an absence of favor or partiality on her part. Ms. Dotson testified that she did not speak to her sister-in-law about the case or her jury service. The court clerk testified that she did not talk to her family or friends about pending court matters and that she never disclosed the Defendant's criminal history to Ms. Dotson. There is no evidence in the record to establish that Ms. Dotson was biased against the Defendant or partial to the State due to her relationship with the court clerk. As such, we conclude that this issue is without merit and that the trial court did not err in denying the Defendant's motion for a new trial on this issue.

*VIII. Cumulative Error*

The Defendant raises, for the first time in his reply brief, the contention that a new trial is warranted due to cumulative error. However, the cumulative error doctrine applies only to rare circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Having discerned no error in this case, there can be no cumulative error. Accordingly, we conclude that this issue is devoid of merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-22-