IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2018 Session

## GEORGE A. STANHOPE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hickman County**
**No. 14-CV-39        Joseph P. Binkley, Jr., Judge**

_____

### No. M2017-00599-CCA-R3-PC

_____

George A. Stanhope, the Petitioner, was convicted of first degree premeditated murder, two counts of first degree felony murder, theft of property valued at $1,000 or more but less than $10,000, and aggravated burglary. The Petitioner received a total effective sentence of life without parole plus ten years. His petition for post-conviction relief was denied by the post-conviction court following a hearing. On appeal, the Petitioner argues that: (1) the State's voir dire and trial counsel's concession to second degree murder during closing argument violated the Petitioner's right to a jury trial and constituted a structural constitutional error; and (2) the Petitioner received ineffective assistance of counsel during voir dire and closing argument. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, P.J., concurred in the results only and filed a separate concurring opinion.

Derek K. Smith, Franklin, Tennessee, for the appellant, George A. Stanhope.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

In this court's opinion in the Petitioner's direct appeal, this court summarized the facts of the Petitioner's case as the following:

The victim, Lillie Moran, was last seen alive on the afternoon of April 5, 2006. Sammy Ferguson testified at trial that he leased a cow pasture adjacent to the ninety-year-old victim's house in a "secluded area" of Hickman County. On April 5, 2006, Mr. Ferguson spoke to the victim in her driveway around 3:00 p.m. when she returned home from a physical therapy appointment. The victim's neighbor, David Oxman, had driven the victim to the appointment in her car, a tan 1998 Ford Escort station wagon. The victim had a follow-up appointment scheduled with the physical therapist for the next day, but the victim never showed up for the appointment and did not answer her phone when the physical therapist's office called to remind her of the appointment.

At approximately 3:00 p.m. on April 6, 2006, Deputy Levi Mobley of the Hickman County Sheriff's Department (HCSD) responded to "a possible death" call at the victim's home. Deputy Mobley testified that he met Mr. Oxman on a side deck of the house near the carport. According to Deputy Mobley, the victim's car was not in the carport and Mr. Oxman was "somewhat" upset. The victim used a side entrance as the main entrance to her home instead of the front door. Deputy Mobley testified that there were pry marks on the screen door and that it "had been apparently forced open." The inside handle of the screen door was broken off and found lying on a washing machine inside the home. A crow bar from the victim's tool shed was found on a bench in the carport. The victim's phone line had been cut and two small plug-in lights the victim kept on her porch were found in the yard "a fairly good distance from the house."

Deputy Mobley testified that he entered the house with another deputy and found the victim in a first floor bedroom. The victim was lying on the bed and "had trauma to the right side of her head." The victim was clothed and "covered up" to her chest with a sheet. The victim's hands were crossed and resting on her torso. A bloody pillow was propped up on the headboard next to the victim's head. A purse and a nightgown were found lying on the bed next to the victim's body. The victim's bed appeared to have been pushed over "about a foot" and several coins were

scattered across the bedroom floor. An empty "coin sorter" was found on the victim's nightstand. Deputy Mobley checked the victim for a pulse and determined that she was dead. Deputy Mobley testified that he did not touch anything else in the bedroom besides the victim's neck and arm.

The evidence at trial established that the [Petitioner]'s grandmother lived on a hill 200 yards from the victim's house. Sometime between 2:00 and 3:00 a.m. on the morning of April 6, 2006, the [Petitioner] pulled into a local gas station driving the victim's car. Tristan Louis Malston testified that he was working at the gas station that morning when the [Petitioner] came in alone. Mr. Malston testified that the [Petitioner] was very quiet that morning. Christopher M. Campbell testified that he was working at the Waffle House in Dickson that morning when the [Petitioner] came into the restaurant by himself around 3:00 a.m. The [Petitioner] left and came back to the restaurant around 7:00 a.m. driving the victim's car. Mr. Campbell testified that he did not have a ride home, so he accepted a ride with the [Petitioner]. Mr. Campbell further testified that he spent the entire day with the [Petitioner] in Nashville and Dickson and that the [Petitioner] had a revolver with him.

The [Petitioner]'s ex-girlfriend, Leandra Smith-Winters, testified that she saw the [Petitioner] at 6:15 a.m. on April 6, 2006, as she was dropping her son off at daycare. According to Ms. Smith-Winters, the [Petitioner] was alone and was driving the victim's station wagon. The [Petitioner] gave Ms. Smith-Winters a ring that morning. According to Ms. Smith-Winters, the [Petitioner] had not had a job since January 2006. The victim's niece, Dorothy L. King, identified the ring the [Petitioner] gave to Ms. Smith-Winters as having belonged to the victim. Ms. King also testified that the victim's station wagon was valued at $3,500 in April 2006. Ms. Smith-Winters testified that she saw the [Petitioner] two more times that day. The [Petitioner] was still driving the victim's car, but Mr. Campbell was with him when she saw him later on in the day.

At approximately 10:30 p.m. on April 6, 2006, Sergeant Jeff Lovell of the Dickson County Sheriff's Department (DCSD) spotted the victim's car pull up to a pay phone at Tuffy's Market. As the [Petitioner] got out of the car to use the pay phone, Sgt. Lovell drew his weapon and ordered the [Petitioner] to lie down on the ground. Sgt. Lovell ordered Mr. Campbell to exit the car and lie down on the ground as well. Deputy Paul Montgomery of the DCSD handcuffed the [Petitioner] and checked his driver's license to confirm his identity. Deputy Montgomery then placed

- 3 -

the [Petitioner] in the backseat of his cruiser and activated the cruiser's audio recording device. At trial, the audio recording was played for the jury. The [Petitioner] told Deputy Montgomery, without any prompting, to "look under the front seat" when he searched the car because there was "a .32 revolver under there." While the [Petitioner] was alone in the cruiser, he stated that he wanted the police to take him to jail so he could call Ms. Smith-Winters and tell her he had been "arrested for murder."

The [Petitioner] was eventually moved from Deputy Montgomery's cruiser to a HCSD cruiser that did not have an audio recording device. Once in the HCSD cruiser, the [Petitioner] started "causing a little bit of a commotion" and motioning for officers to come to the cruiser. Sgt. Carl Hutchinson of the HCSD testified that when he approached the cruiser, the [Petitioner] said that he knew "what this [was] all about . . . [h]omicide." Sgt. Hutchinson went and got Jimmy Barnett, then a detective with the HCSD, to come speak with the [Petitioner]. Mr. Barnett testified that the [Petitioner] repeatedly told him that he knew "what this [was] about." Mr. Barnett eventually asked the [Petitioner], "what" it was all about, and the [Petitioner] responded "homicide." The [Petitioner] then pointed at Mr. Campbell and said that Mr. Campbell "didn't have anything to do with it."

Mr. Barnett testified that the [Petitioner] stated that he had left his grandmother's house the night before and had gone to the victim's house. The [Petitioner] told Mr. Barnett that he cut the victim's phone line with a knife and then knocked on her door to ask if he could use the phone. The victim answered the door and invited the [Petitioner] inside. The [Petitioner] told Mr. Barnett that the victim was holding a gun when she answered the door. The [Petitioner] asked for a glass of water and sat down in the living room. Eventually, the victim put her gun down on a table. The [Petitioner] told Mr. Barnett that he picked up the gun, and made the victim go into her bedroom and lie down on the bed. The [Petitioner] stated that he put a pillow over the victim's head and shot her twice in the head.

Sgt. Hutchinson testified that he heard most of what the [Petitioner] said to Mr. Barnett and corroborated Mr. Barnett's recollection of the [Petitioner]'s statements. Sgt. Hutchinson also testified that the [Petitioner] said, "I probably f—ked up, didn't I" after he told Mr. Barnett that he shot the victim. All of the officers involved in the [Petitioner]'s arrest who testified at trial stated that they did not tell the [Petitioner] why he was being arrested and did not hear anyone else tell the [Petitioner] he had been

- 4 -

arrested for a homicide. Mr. Campbell testified that he repeatedly asked the officers why he was being detained, but none of the officers responded to his questions. However, Mr. Campbell testified that he could not hear what the officers said to the [Petitioner]. Later that night, samples were taken from the [Petitioner]'s hands to test for gun[]shot residue, and the [Petitioner] gave the police his clothes for forensic testing. The next day, the [Petitioner] told Mr. Barnett that he did not know why he killed the victim because she was the only person that was ever nice to him.

A Smith & Wesson .32 long caliber revolver was recovered under the driver's seat of the victim's car after the [Petitioner]'s arrest. Constable Jerry Deal testified that the gun recovered from the victim's car belonged to the victim and that she kept it in her nightstand for protection. Shelly Betts, a forensic scientist with the Tennessee Bureau of Investigation (TBI) and an expert in tool mark and firearms identification, testified that .32 caliber guns were relatively uncommon and "not a very popular revolver." When the revolver was recovered, it had four unfired Winchester .32 caliber cartridges in the cylinder and two empty chambers. Ms. Betts testified that the recovered cartridges contained "copper coated brown nose lead bullets." Police recovered a fired bullet underneath the victim's body when it was moved from the bed. A second fired bullet was found during the victim's autopsy in the sheet her body had been wrapped in.

Ms. Betts testified that the pillow found above the victim's head had two bullet holes in it. Ms. Betts opined that both shots were "contact or near contact gunshots." Ms. Betts also testified that the fired bullets were .32 caliber, "copper coated lead with a round nose." Ms. Betts opined that the fired bullets were "the same type and design" as the bullets found in the unfired cartridges found in the revolver. Ms. Betts also opined that the fired bullets were "consistent with being manufactured by Winchester," like the unfired cartridges. The fired bullets were too badly damaged for Ms. Betts to make a conclusive determination as to whether they had been fired from the victim's gun. However, there were no dissimilarities between the bullets recovered at the crime scene and bullets test-fired from the gun. Ms. Betts testified that both of the fired bullets had the same "class characteristics" and one bullet had "similar individual characteristics" with the test-fired bullets.

Ms. Betts also testified about the cut to the victim's phone line and the pry marks on the victim's screen door. Ms. Betts opined that the cut to the phone line had been made with a single-blade cutting tool like a knife or

a box cutter. Ms. Betts testified that there were pry marks both below and above the handle to the screen door. Ms. Betts opined that the pry marks on the door were made by "a prying type tool" like the crowbar found in the victim's carport. Ms. Betts also opined that the marks were the same size as the crowbar, but she testified that "there were not individual characteristics to link the crowbar to the tool marks on the door." TBI agents searched the victim's house for fingerprints but were unable to find any identifiable prints in this case.

Laura Hodge, a TBI forensic scientist and expert in gunshot residue, testified that the samples taken from the [Petitioner]'s hands were inconclusive for gunshot residue. Ms. Hodge explained that to determine if gunshot residue was present she looked for three specific chemical elements in specific quantities. Ms. Hodge testified that all three of the elements were present in the samples from the [Petitioner]'s hands, especially his left palm, but not in sufficient quantities to say the [Petitioner] tested positive for gunshot residue. Ms. Hodge further testified that gunshot residue was "very fragile" and could easily be destroyed by wiping or washing the affected area. No gunshot residue was found on the [Petitioner]'s clothing. However, three bloodstains were found on the [Petitioner]'s jeans. Two of the stains were a "complete" match with the victim's DNA and the third stain was a partial match.

. . . .

David Brundage testified on behalf of the [Petitioner] as an expert in tool mark and firearms identification. Mr. Brundage opined that the pry marks on the screen door were made by a rounded tool and were inconsistent with the crowbar found in the victim's carport. Mr. Brundage also opined that he "could not positively identify nor eliminate" the fired bullets recovered from the victim's bed as having been fired from the gun found under the driver's seat of the victim's car.

Based upon the foregoing evidence, the jury convicted the [Petitioner] of first degree premeditated murder, two counts of first degree felony murder, theft of property valued at $1,000 or more but less than $10,000, and aggravated burglary. The jury acquitted the [Petitioner] of the charge of aggravated rape and the related count of first degree felony murder.

*State v. Stanhope*, 476 S.W.3d 382, 388-92 (Tenn. Crim. App. 2013). The trial court merged the two first degree felony murder convictions with the first degree premeditated murder conviction, and the jury imposed a sentence of life without the possibility of parole for the first degree premeditated murder conviction. *Id.* at 387. Following a sentencing hearing, the trial court imposed a sentence of six years for the aggravated burglary conviction and a sentence of four years for the theft conviction. *Id.* The trial court ordered the sentences to be served consecutive to each other and to the sentence for the first degree premeditated murder conviction, for an effective sentence of life without the possibility of parole plus ten years. *Id.* This court affirmed the judgments of the trial court. *Id.* at 404. The Petitioner did not seek review of his convictions and sentences from the Tennessee Supreme Court.

On April 14, 2014, the Petitioner filed a timely pro se petition for post-conviction relief. After appointment of counsel, the Petitioner filed an amended and a second amended petition for post-conviction relief. In his petitions, the Petitioner argued, in part, that a portion of the prosecutor's questions during voir dire "were inappropriate, unfair, and prejudicial to [the Petitioner], and [t]rial [c]ounsel should have objected at the time they were asked and given." The Petitioner asserted that these questions created a presumption of his guilt and shifted the burden of proof from the State to the Petitioner. The Petitioner argued that he received ineffective assistance of counsel based on lead trial counsel's failure to object during voir dire. The Petitioner argued that "the constitutional error overlooked by [the Petitioner]'s [lead] [t]rial [c]ounsel must be presumed to have affected the outcome of the case, because it is so fundamental." The Petitioner also argued that he received ineffective assistance of counsel because co-counsel argued to the jury that the Petitioner was guilty of second degree murder and not first degree murder during closing argument. The Petitioner asserted that lead trial counsel and co-counsel failed to consult with him about this trial strategy decision.

At the post-conviction hearing, lead trial counsel testified that he was appointed to represent the Petitioner. Lead trial counsel stated that he had practiced mainly criminal and juvenile law since 1999. He agreed that he did not object when the prosecutor informed potential jurors that "the defendant" controlled the crime scene during voir dire. The following excerpt from the trial transcript was admitted into evidence:

> [THE STATE:] Ms. Mangrum, who would you say controls the scene of the crime?
>
> VENIREMAN MANGRUM: The officers.
>
> [THE STATE:] The officers. Anybody have another? Everybody agree with that or -- Ms. Gant?

VENIREMAN GANT:  How about the medical examiner.

[THE STATE:]  Medical examiner.  Everybody like those answers?

(No response.)

[THE STATE:]  Wrong.  The defendant, the defendant controls the scene of the crime.  Who controls when the crime is committed?  The defendant.  Who controls what witnesses are there?

THE VENIRE:  The defendant.

[THE STATE:]  The defendant.  Who controls what type of physical evidence is left at a crime scene?

THE VENIRE:  The defendant.

[THE STATE:]  Who controls how much reasonable doubt's left at the crime scene?

THE VENIRE: The defendant.

[THE STATE:]  The defendant.  If -- does anyone here think that a defendant should be rewarded for controlling the scene of the crime; is there anybody that feels that way?

(No response.)

[THE STATE:]  Thank you.

Lead trial counsel stated that co-counsel referred to the prosecutor's voir dire comments during opening statements.  The following excerpt from co-counsel's opening statement was admitted into evidence:

There was one thing that especially concerned me -- disturbed me yesterday, and that was the idea that the defendant controls the crime scene. The defendant controls reasonable doubt.  Now, the perpetrator does have some influence over the crime scene.  The defendant has none, and they are not the same thing.

Lead trial counsel agreed that this portion of co-counsel's opening statement was an attempt to cure the prosecutor's voir dire. When asked if the prosecutor's voir dire was objectionable, lead trial counsel stated that there was no objection at trial and that he did not think that it was "[his] call at this point." Lead trial counsel agreed that the reference to "the defendant" in the prosecutor's voir dire referred to the Petitioner. Lead trial counsel also stated that, if the prosecutor had used the Petitioner's name instead of "the defendant" in its voir dire, the trial court would have sua sponte declared a mistrial. He testified that, if neither he nor co-counsel objected to the prosecutor's voir dire, then the Petitioner likely could not have raised the issue on direct appeal.

Lead trial counsel agreed that, during closing arguments, co-counsel made the following statement: "And if you take your oath seriously, you'll go to the verdict form, and as to premeditated murder, you'll find second-degree. As to the alternative felony murder, it's still second-degree, and it's still second-degree, it's still second-degree, (indicating)." Lead trial counsel could not recall whether, prior to closing arguments, he discussed conceding to second degree murder with co-counsel. Lead trial counsel stated that it was his practice to discuss conceding guilt with a client before doing so. He could not recall whether he or co-counsel discussed conceding to second degree murder with the Petitioner.

On cross-examination, lead trial counsel testified that the proof of guilt and premeditation was overwhelming at the Petitioner's trial. He stated that he communicated with the Petitioner during his representation and that there was no conflict between the Petitioner and himself. Lead trial counsel explained that he usually does not object during voir dire, opening statements, and closing arguments. He agreed that his defense of the Petitioner would have been successful if the jury had returned a verdict of second degree murder instead of first degree murder.

The Petitioner testified that neither lead trial counsel nor co-counsel consulted with him about whether to concede that the Petitioner was guilty of second degree murder during closing argument. He explained that lead trial counsel and co-counsel did not discuss trial strategy with him. The Petitioner stated that, if lead trial counsel and co-counsel had advised that it was in his best interest to concede to second degree murder, he would not have agreed to that strategy.

The post-conviction court denied relief in a written order filed on February 23, 2017. The post-conviction court found that the Petitioner "claimed [lead] [t]rial [c]ounsel's deficient representation during the (a) voir dire; (b) cross examination of witnesses, and (c) closing arguments constituted ineffective assistance of counsel." The post-conviction court found that, based on the testimony of lead trial counsel, co-counsel "attempt[ed] to cure the voir dire at trial" by stating that "the perpetrator does have some

influence over the crime scene. The defendant has none, and they are not the same thing." Regarding the Petitioner's claim of ineffective assistance of counsel during closing argument, the post-conviction court found that lead trial counsel testified that the proof of guilt and premeditation was overwhelming at trial, that he communicated with the Petitioner throughout the case, and that lead trial counsel would have considered his representation of the Petitioner a success if the Petitioner had been convicted of second degree murder instead of premeditated first degree murder. The post-conviction court credited lead trial counsel's testimony. The post-conviction court found that the Petitioner testified that he did not consent to lead trial counsel's closing argument strategy of conceding to second degree murder and that he would not have agreed to such a strategy if lead trial counsel had consulted with him. However, the post-conviction court did not find the Petitioner's testimony at the hearing to be credible.

The post-conviction court concluded that "the statements made by the State's Attorney to the potential jurors did not constitute an unconstitutional instruction to the jury that shifted the burden of proof against [the Petitioner]." Therefore, the post-conviction court analyzed the Petitioner's argument under *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The post-conviction court then concluded that "[lead] [t]rial [c]ounsel's failure to object to the State's Attorney's voir dire statements did not amount to ineffective assistance of counsel" because the Petitioner did not establish that lead trial counsel's failure to object amounted to deficient performance and because co-counsel "cured any harm caused by not objecting to the voir dire in his subsequent statements to the jury" during opening statement.

Regarding the Petitioner's argument that lead trial counsel's performance during closing argument was deficient and that he was prejudiced by the deficient performance, the post-conviction court concluded that lead trial counsel's closing argument "d[id] not amount to deficient counsel[] because [lead] [t]rial [c]ounsel was merely attempting to perform [his] trial strategy to prevent a premeditated first degree murder conviction[.]" The post-conviction court also concluded that the Petitioner was not prejudiced by lead trial counsel's closing argument because the proof of the Petitioner's guilt at trial was overwhelming.

The Petitioner now timely appeals the post-conviction court's denial of relief.

**II. Analysis**

On appeal, the Petitioner argues that: (1) the prosecutor's voir dire and co-counsel's concession of second degree murder created a structural constitutional error that violated the Petitioner's right to a jury trial; and (2) the Petitioner received ineffective assistance of counsel during voir dire and closing argument.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Structural Constitutional Error*

Initially, the State contends that this issue is waived because it was not presented to the court below. The State asserts that "[the] Petitioner's only claim regarding voir dire was that his trial counsel was ineffective for failing to object to the statements made by the State's attorney[,]" and thus, "[a]s a result, the post-conviction court's order only addresses the claim in the context of ineffectiveness." The Petitioner responds that he "specifically asserted that the prosecutor's statements during the voir dire portion of the trial could not be considered harmless error" and "specifically referred to the cases of *Chapman v. California*, 87 S. Ct. 824 (1967) and *Bollenbach v. United States*, 66 S. Ct. 402 (1946), two cases that address harmless error and its applicability to structural constitutional errors occurring during trial" in his second amended petition. The Petitioner also notes that he raised the issue of structural constitutional error at the post-conviction hearing.

We agree with the Petitioner that he raised the issue that the State committed structural constitutional error during voir dire at the post-conviction court level. While the Petitioner's raising of this issue in his petitions and at the post-conviction hearing was not a paragon of specificity and clarity, we note that the post-conviction court concluded that "the statements made by the State's Attorney to the potential jurors did not constitute an unconstitutional instruction to the jury that shifted the burden of proof against [the Petitioner]." Thus, the post-conviction court ruled on the issue and concluded that the prosecutor's voir dire questioning was not structural constitutional error.

The State also asserts that this issue is waived "because Tennessee's post-conviction procedure does not permit relief to be granted on issues that could have been litigated at trial or on direct appeal."

Tennessee Code Annotated section 40-30-106(g) states the following:

(g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g).

In *Phillips v. State*, this court stated the following:

We do not believe that one should be permitted to raise a question in a post[-]conviction proceeding that was waived by failure upon the trial, by design or otherwise, to timely raise it when our procedural law prescribes that it should be raised. To permit this type procedure would make a sham of the trial itself. When the constitutional right asserted was as well recognized at the time of the trial as now, and a procedure for asserting it was prescribed, failure to then assert the claimed right upon the trial waives it and prohibits its subsequent assertion in a post[-]conviction proceeding. A [petitioner] should not be permitted to 'save back his rights'; take his chance of acquittal by a jury, then attack that same jury post conviction.

458 S.W.2d 642, 644-45 (Tenn. Crim. App. 1970).

In *State v. Townes*, this court stated the following:

The opportunity to raise the issue during a direct appeal of the conviction, coupled with a failure to pursue that appeal or a failure to raise the issue during that appeal, constitutes a waiver of the issue pursuant to [Tennessee]

Code [Annotated] section 40-30-206(g) for purposes of a post-conviction relief proceeding.

56 S.W.3d 30, 35-36 (Tenn. Crim. App. 2000) (citing *State v. Benson*, 973 S.W.2d 202, 208 (Tenn. 1998); *Alley v. State*, 958 S.W.2d 138, 148 (Tenn. Crim. App.1997)), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355, 359 (Tenn. 2003). In *Jason Curtis Johnson v. State*, the petitioner argued that trial counsel was deficient for failing to object during voir dire. No. M2015-00258-CCA-R3-PC, 2015 WL 9581560, at *14 (Tenn. Crim. App. Dec. 30, 2015), *no perm. app. filed*. This court stated that "[t]o the extent that the [p]etitioner raise[d] a free-standing claim that his Sixth Amendment rights were violated because the venire did not contain a representative cross-section of the community, this claim [was] waived for the purposes of post-conviction relief." *Id.* (citing Tenn. Code Ann. § 40-30-106(g) (2014)). Similarly, in *Timothy L. Diggs, Sr. v. State*, this court concluded that the petitioner's due process claim "relative to the trial judge's consideration of lesser included offenses" was waived on post-conviction "[b]ecause the [p]etitioner could have presented his argument that the trial judge did not consider lesser included offenses at either the trial or on direct appeal, but did not do so[.]" No. M2015-00503-CCA-R3-PC, 2016 WL 768956, at *5 (Tenn. Crim. App. Feb. 29, 2016), *no perm. app. filed*.

Here, we conclude that the Petitioner's free-standing claim that the prosecutor's questions during voir dire and co-counsel's concession to second degree murder violated his Sixth Amendment right to a jury trial has been waived because the Petitioner failed to present this claim to the trial court in his motion for new trial or to this court on direct appeal. *See* Tenn. Code Ann. § 40-30-106(g). We also conclude that neither of the exceptions in section 40-30-106(g) apply. The Petitioner's claim is not "based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right" and the Petitioner's failure to present this issue to a court of competent jurisdiction was not "the result of state action in violation of the federal or state constitution." Tenn. Code Ann. § 40-30-106(g) (1)-(2).

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland*, 466 U.S.at 687; *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Voir Dire*

The Petitioner argues that lead trial counsel's performance was deficient for failing to object to the prosecutor's questioning during voir dire. The State contends that "[r]ather than objecting, trial counsel chose to address the matter during his opening statement and explained that, in his opinion, this cured any problems with the State's voir dire questioning."

At the post-conviction hearing, lead trial counsel stated that neither he nor co-counsel objected to the prosecutor's questioning during voir dire. Lead trial counsel also agreed that during opening statement co-counsel attempted to cure the issue of the prosecutor's questions by mentioning who controlled the crime scene and differentiating between "the defendant" and "the perpetrator[.]" The post-conviction court found that co- counsel "attempt[ed] to cure the voir dire at trial" by stating that "the perpetrator does

have some influence over the crime scene. The defendant has none, and they are not the same thing."

In *William Glenn Rogers v. State*, this court stated the following about defense counsel's representation during voir dire:

> As the United States Court of Appeals for the Sixth Circuit has asserted, "[a]mong the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense." *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001). By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster. *See United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973).

> Despite its significance, a trial lawyer is "accorded particular deference when conducting voir dire" and his or her "actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). Also, "[a] strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.* Thus, it is imperative for a petitioner claiming ineffective assistance of counsel during jury selection to demonstrate that the resulting jury was not impartial. *See Smith[ v. State]*, 357 S.W.3d [322], 348 [(Tenn. 2011)] (citing *James A. Dellinger v. State*, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007)).

No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at * 35-36 (Tenn. Crim. App. Aug. 30, 2012), *perm. app. denied* (Tenn. Dec. 11, 2012).

Here, we conclude that the Petitioner did not receive ineffective assistance of counsel during voir dire. While it is unclear whether lead trial counsel and co-counsel did not object to the prosecutor's questioning during voir dire as a part of trial strategy, it is apparent that co-counsel had the opportunity to address the prosecutor's voir dire in opening statements. Co-counsel used that opportunity to argue to the jury that "the perpetrator" had control over the crime scene, not "the defendant[.]" Further, we conclude that the Petitioner has not presented evidence that the jury empaneled in his trial was not impartial. He is not entitled to relief on this ground.

- 15 -

### Closing Argument

The Petitioner asserts that "[lead] [t]rial counsel conceded [the] Petitioner's guilt to the offense of second degree murder without first obtaining the consent of [the] Petitioner, and more importantly, without even discussing the concession prior to tendering it to the jury." The State argues that "the post-conviction court appropriately found that [lead] trial counsel's strategy was more than appropriate given the overwhelming evidence of guilt."

At the post-conviction hearing, lead trial counsel could not recall whether, prior to closing arguments, he discussed conceding to second degree murder with co-counsel but he stated that he would discuss conceding guilt with a client before doing so. The Petitioner testified that neither lead trial counsel nor co-counsel consulted with him about whether to concede that the Petitioner was guilty of second degree murder during closing argument. He stated that, if lead trial counsel and co-counsel had advised that it was in his best interest to concede to second degree murder, he would not have agreed to that strategy. The post-conviction court concluded that lead trial counsel's closing argument "d[id] not amount to deficient counsel[] because [lead] [t]rial [c]ounsel was merely attempting to perform [his] trial strategy to prevent a premeditated first degree murder conviction[.]" The post-conviction court also concluded that the Petitioner was not prejudiced by lead trial counsel's closing argument because the proof of the Petitioner's guilt at trial was overwhelming.

We conclude that the post-conviction court properly denied relief on this claim. The post-conviction court credited the testimony of lead trial counsel, who testified that he would have discussed whether to concede to a lesser-included offense during closing argument with a client. "A criminal defendant's federal and state constitutional right to the effective assistance of counsel extends to closing argument; however, courts afford counsel 'wide latitude' in how best to present a client's case to the jury." *Robert Earl Smith v. State*, No. W2010-00305-CCA-R3-PC, 2011 WL 3912811, at *8 (Tenn. Crim. App. Sept. 7, 2011) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5, (2003); *Torrez Talley v. State*, No. W2009-02036-CCA-R3-PC, 2011 WL 1770485, at *4 (Tenn. Crim. App. May 9, 2011)), *perm. app. denied* (Tenn. Jan. 13, 2012). The Petitioner has not established that lead trial counsel's performance was deficient for failing to consult with the Petitioner regarding the closing argument. He is not entitled to relief on this ground.

## III. Conclusion

Based on the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE