IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2026 Session

## STATE OF TENNESSEE v. ALBERT DEJUAN WHITE

**Appeal from the Circuit Court for Tipton County**
**No. 11361     A. Blake Neill, Judge**

_____

**No. W2025-00253-CCA-R3-CD**
_____

Defendant, Albert Dejuan White, appeals his Tipton County Circuit Court trial convictions of possession with intent to deliver twenty-six grams or more of cocaine, possession of a firearm during the commission of a dangerous felony, and possession of drug paraphernalia, arguing that the trial court erred by denying his motion to suppress evidence and statements obtained during the search of his residence and that the evidence was insufficient to support his convictions. Discerning no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which KYLE A. HIXSON, J., joined. STEVEN W. SWORD, J., concurring in part and concurring in the results.

Josie Holland, Memphis, Tennessee (on appeal); and J. Barney Witherington, IV (at trial), for the appellant, Albert Dejuan White.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Mark Davidson, District Attorney General; and Sean Hord and Jason Poyner, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant's convictions for possession of cocaine with the intent to deliver, possession a firearm during the commission of a dangerous felony, and possession of drug paraphernalia arose from the July 11, 2023, execution of a search warrant at the residence Defendant shared with his elderly parents.

**Factual and Procedural Background**

On March 4, 2024, the Tipton County Grand Jury charged Defendant with one count of possession with intent to deliver twenty-six grams or more of cocaine, *see* Tenn. Code Ann. § 39-17-417, one count of possession with intent to deliver one-half ounce or more of marijuana, *see id.*, one count of possession of a firearm during the commission of or attempt to commit the dangerous felony of cocaine possession after having previously been convicted of two felony offenses, *see id.* § 39-17-1324, and one count of possession of drug paraphernalia, *see id.* § 39-17-425.

## I. Motion to Suppress

Following his indictment, Defendant moved to suppress the evidence obtained during the search of the residence he shared with his parents ("the residence"), arguing that the affidavit in support of the search warrant did not contain facts sufficient to establish a nexus between the alleged criminal conduct and the residence, and the statements he made to law enforcement officers during the execution of the warrant, arguing that the statements were taken in the absence of *Miranda*[1] warnings.

At the hearing on the motion, Tipton County Sheriff's Office ("TCSO") Investigator Christopher Baylous testified that he led an investigation into Defendant's alleged drug activity and that, as part of his investigation, he obtained and executed a search warrant at the address listed on Defendant's driver's license, car registration, and cell phone account. The investigator testified that before obtaining the search warrant, he and other officers monitored a series of three completed controlled buys between Defendant and a confidential informant[2] in front of the residence using GPS-equipped recording equipment and a camera-equipped drone. Additionally, a fourth controlled buy was scheduled to occur at the residence on the day the warrant was executed. The investigator applied for a warrant to search the residence and premises where the controlled buys occurred for: "Any evidence which could have been used to facilitate or otherwise contribute to the possession, sale, manufacture, or delivery of Schedule II narcotics, including but not limited to narcotics, ledgers, cellular telephones, paraphernalia, and or proceeds gained or comingled with proceeds obtained through the illegal trafficking of narcotics." The affidavit in support of the search warrant, which was also exhibited to the investigator's testimony, contained the following factual basis:

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The informant also testified at the hearing, but we have not included her testimony because our review of the validity of the search warrant is confined to the information included in the affidavit.

**Statement of Facts and Circumstances In Support of Probable Cause**

Investigator Chris Baylous states the following under oath:

(Background of Investigation) After several months of receiving intel that [Defendant][3] was conducting narcotics transactions at multiple locations throughout Tipton County, Tennessee, as well as, his residence of 356 Walton Loop, Covington, Tipton County, Tennessee 38019, Investigators began attempting to acquire a confidential informant to utilize for the purpose of purchasing illegal narcotics from [Defendant]. On multiple occasions, Tipton County Sheriff's Office Narcotics Investigators spoke with undercover agent 00420, about [Defendant]. Undercover agent 00420 advised that they were very aware of [Defendant], and he is most commonly known as "Big Juan." When asked if whether or not they could purchase narcotics from [Defendant], undercover agent 00420 stated "yes, that when they were previously a drug user, they purchased cocaine from [Defendant]. Undercover Agent 00420 then spoke with [Defendant], and arranged a narcotics transaction for $100.00 worth of powder cocaine.

(Incident # 2307051710) On 05 July 2023, Tipton County Sheriff's Office Narcotics Investigators met with Undercover Agent 00420 in reference to a prearranged deal to purchase 1.5 grams of Cocaine for $100.00 from [Defendant]. The agent was provided $100.00 in TCSO Drug Fund currency to conduct the narcotics transaction. The UA was also equipped with audio and surveillance equipment to observe and live time monitor the transaction. The Undercover Agent met [Defendant] at his residence located at 356 Walton Loop in Covington, TN and purchased 1.5 grams of a white powdery substance for $100.00. Investigators remained in the area conducting surveillance until the transaction was completed. After making the purchase, the UA returned to a predetermined location and Investigator Baylous took possession of the 1.5 grams of white powdery substance and placed it into evidence. Prior to the 1.5 grams of powdery substance being placed into evidence it was field tested. The result of the field test

---

[3] We have omitted Defendant's date of birth and social security number.

indicated a positive result for the presence of cocaine. The 1 5 grams will be submitted for testing and this incident will be forwarded to the District Attorney for consideration of prosecution for Delivery of Schedule II. This incident occurred at approximately 1710 hours. Prior to and upon completion of the operation both the Undercover Agent and Undercover Agent's vehicle were searched. This transaction was also observed by Investigator Brandon Williams.

(Incident # 2307061800) On 06 July 2023, Tipton County Sheriff's Office Narcotics Investigators met with UA 00420 in reference to a prearranged deal to purchase 1.5 grams of Cocaine (powder) and 1.5 grams of Cocaine (rock) for $200,00 from [Defendant]. The agent was provided $200.00 in TCSO Drug Fund currency to conduct the narcotics transaction. The UA was also equipped with audio and surveillance equipment to observe and live time monitor the transaction. The Undercover Agent met [Defendant] at his residence located at 356 Walton Loop in Covington, TN and purchased 1.5 grams of a white powdery substance and 1.5 grams of a white rock substance for $200.00. Investigators remained in the area conducting surveillance until the transaction was completed. After making the purchase, the UA returned to a predetermined location and Investigator Baylous took possession of the 1.5 grams of white powdery substance along with the 1.5 grams of white rock substance and placed it into evidence. The 1.5 grams of powder and 1.5 grams of rock will be submitted for testing and this incident will be forwarded to the District Attorney for consideration of prosecution for Delivery of Schedule II. This incident occurred at approximately 1800 hours. Prior to and upon completion of the operation both the UA and UA's vehicle were searched. This transaction was also observed by Investigator Brandon Williams.

(Incident # 2307072000) On 07 July 2023, Tipton County Sheriff's Office Narcotics Investigators met with UA 00420 in reference to a prearranged deal to purchase 4 grams of Cocaine (powder) and 4 grams of Cocaine (rock) for $400.00 from [Defendant]. The agent was provided $400.00 in TCSO Drug Fund currency to conduct the narcotics transaction. The UA was also equipped with audio and surveillance equipment to observe and live time monitor the transaction. The Undercover Agent met [Defendant] at his residence located at 356 Walton

Loop in Covington, TN and purchased 4 grams of a white powdery substance and 4 grams of a white rock substance for $400.00. Investigators remained in the area conducting surveillance until the transaction was completed. After making the purchase, the UA returned to a predetermined location and Investigator Baylous took possession of the 4 grams of white powdery substance along with the 4 grams of white rock substance and placed it into evidence. The 4 grams of powder and 4 grams of rock will be submitted for testing and this incident will be forwarded to the District Attorney for consideration of prosecution for Delivery of Schedule II. This incident occurred at approximately 2000 hours. Prior to and upon completion of the operation both the UA and UA's vehicle were searched. This transaction was also observed by Investigator Brandon Williams.

(Continuation of Investigation) Due to the fact that multiple transactions between Undercover Agent 00420 and [Defendant], have occurred, I believe that [Defendant] is in possession of a large quantity of illegal narcotics and has been known to hide large quantities of narcotics, proceeds from narcotics transactions and/or other evidence throughout his property in locations not commonly located or accessed by law enforcement. Furthermore on 7-11-2023 UA 00420 advised that another transaction was scheduled for 7-11-2023.

(Undercover Agent Reliability) Undercover Agent 00420, has been a paid Informant with the Tipton County Sheriff's Office since June of 2022 Undercover Agent 00420 has conducted no less than twenty (20) undercover operations with the Tipton County Sheriff's Office involving the purchasing and intelligence gathering of multiple narcotics traffickers within Tipton County. Tennessee. The Undercover Agent began their assistance with providing names of known narcotics traffickers within Tipton County, Tennessee, fo11owed by: purchasing narcotics from those narcotics traffickers for Investigators to present to the District Attorney for consideration of prosecution. Many of those transactions are set to be presented to the Tipton County Grand Jury in upcoming term(s). On every undercover operation conducted utilizing Undercover Agent 00420 as a purchaser of narcotics and/or intelligence gathering, they have been successful on both segments. In all

5

accounts, the Undercover Agent has been determined to be extremely reliable and trustworthy.

**Experience and Basis of Knowledge of Affiant**

Investigator Chris Baylous, with the Tipton County Sheriff's Office since August 2017, having the authority as an active sworn law enforcement officer by statute from Tennessee Code Annotated 38-08-107 et. seq. I graduated from the Tennessee Law Enforcement Training Academy (TLETA) in March of 2018 and am currently assigned to the Criminal Investigations Division. I have six years of service in law enforcement, all of which have been with the Tipton County Sheriff's Office. My law enforcement experience includes specialized training in the areas of patrol techniques, firearms training, special weapons and tactics, police supervisor course, crime scene management and processing, case file documentation, interview and interrogation techniques, evidence processing, and courtroom procedures and testimony. I have been assigned to the Criminal Investigation Division of the Tipton County Sheriff's Office holding the rank of Investigator since May 2023. I have also previously served in the United States Armed Forces both in the United States Marine Corps as well as the United States Army where I was Honorably Discharged achieving the rank of Staff Sergeant. I have been a P.O.S.T certified law enforcement officer since graduating the academy and have maintained my certification with a minimum of forty hours of in service training each year.

**CONCLUSION**

Therefore, considering the foregoing, your Affiant believes based on his knowledge, training and experience that evidence of violations of Tennessee Code Annotated § 39-17-417, Possession of Schedule II narcotics with the intent to manufacture, sell and/or deliver will be located at the residence.

Based on the information contained in the affidavit, the trial court issued a warrant to search: the residence, "[a]ll outer buildings located on the premises," "[a]ll vehicles located on the premises," "[a]ll open areas or property grounds located on the premises," "[a]ll locked and unlocked compartments/safes and bedrooms within" the residence, and "[a]ny attic spaces or other spaces within" the residence.

6

Investigator Baylous testified that SWAT officers arrived at the residence before he did and placed Defendant in handcuffs. When he arrived, the investigator told Defendant that they were there to execute a search warrant and provided him with a copy of the warrant. Investigator Baylous said he did not provide Defendant with *Miranda* warnings because he did not intend to ask Defendant any questions.

At some point, Investigator Brandon Williams told Investigator Baylous that Defendant "was going to show us where the narcotics were located on the property." Investigator Baylous asked Defendant whether he was "going to show us where the drugs are," and Defendant told officers that "they were out towards the shed, and he started walking that direction." Officers found the narcotics in a shed behind the house. Investigator Baylous stated that Defendant made no other statements at the scene. Investigator Baylous said that because the search warrant was for the residence, grounds, any outbuildings or vehicles on the premises, officers would have searched the shed regardless of what Defendant told them.

Investigator Williams testified that he monitored each of the controlled transactions between Defendant and the confidential informant, all of which occurred in the road in front of the residence or in its driveway. Investigator Williams recalled speaking to Defendant on the day of the search but said that he did not provide *Miranda* warnings to Defendant because he "didn't ask him any questions" related to the investigation. He stated that although he could not recall how their conversation began, Defendant asked him to take his elderly parents back into the house. Investigator Williams told Defendant that he knew that the officers were there to execute a search warrant and that he would be glad to "speed up the process." At that point, Defendant said that he would "show [officers] where everything is if we can get my mama and daddy back in the house out of the weather." Investigator Williams denied telling Defendant directly that they would allow his parents to go inside more quickly if Defendant told them where the drugs were located.

TCSO Deputy Zach Wallace, who was one of the first officers to arrive to help execute the search warrant, recalled that when the officers began to arrive, Defendant was standing in the driveway of the residence. As soon as he saw the officers, Defendant "threw two small bags with a white substance into the ditch across the street." Defendant was placed in handcuffs immediately thereafter.

Defendant testified that at the time of the search of the residence, he lived there with his parents because his mother was sick and he had temporarily separated from his wife. Defendant said that he kept all his possessions in a single room at the residence and that he was free to come and go as he wished from that room.

Defendant argued that the facts as alleged in the affidavit in support of the search warrant were insufficient to establish a nexus between the controlled buys and the residence itself because it did not contain any information to establish that Defendant resided there.

In a written order denying the motion, the trial court described the issue as "a close call" but concluded that the affidavit contained sufficient facts to support the finding of probable cause to search the residence. The court observed that (1) all three controlled buys occurred at the residence, (2) the controlled buys occurred on consecutive days, and (3) the affidavit explicitly provided that the transactions occurred at Defendant's residence.

## II. Bench Trial

Immediately prior to trial, the State dismissed Count 4 of the indictment, which charged Defendant with possession with intent to deliver marijuana, and proceeded to a bench trial on the remaining charges.

Investigator Baylous testified that after arranging multiple controlled buys between Defendant and a confidential informant at Defendant's residence, he obtained and executed a search warrant at Defendant's residence on July 11, 2023. He said that members of the SWAT team "intercepted" Defendant "during the exchange or just prior to when the [fourth] exchange was supposed to happen." Defendant was detained in handcuffs, and his family members were escorted outside to wait.

During the search, officers found a 12-gauge shotgun "propped up in the corner" of a bedroom that contained numerous personal items belonging to Defendant, including copies of his driver's license bearing the address of the residence, bank deposit slips with that same address, a police report from an accident listing Defendant's address as the residence, Defendant's social security card, and clothing and shoes consistent with Defendant's size. A personal safe found in the room contained $8,022 in cash.

Officers discovered "a prepackage of green plant-like material believed to be marijuana" and a bag containing 80.5 grams of "a white powder substance" "located in an outbuilding behind the primary residence." Investigator Baylous said that while he was searching another part of the property, Investigator Williams approached him and said that Defendant had agreed to tell them where the narcotics were located. He stated that he then asked Defendant "to confirm that he was going to show us where the narcotics were" and that Defendant "walked us to a shed that was behind the residence." Investigator Baylous said that the shed was listed in the search warrant as part of the property to be searched and that officers would have searched the shed even if Defendant had not led them to it.

During cross-examination, Investigator Baylous agreed that in his type-written report, he stated that he had asked Defendant to show them where the drugs were located. Investigator Baylous said that he conducted surveillance on the residence at times other than the controlled buys and observed Defendant coming and going from the residence. Investigator Baylous stated that Defendant selected the location where the controlled buys were to occur. Investigator Baylous said that Investigator Williams observed Defendant on the property during each transaction. He stated that "at least two" of the transactions occurred "directly in front of the residence at the end of the driveway."

8

During redirect examination, Investigator Baylous testified that he considered the driveway to be a part of the residence. He also stated that officers did not discover any documents that listed a different address for Defendant. Investigator Baylous recalled that Defendant testified at the suppression hearing that he was living at the residence at the time of the controlled buys and the search. He testified that he discovered that Defendant had a prior conviction for felony evading arrest.

Deputy Wallace testified consistently with his testimony at the suppression hearing during direct examination, and we will not repeat it here. During cross-examination, the deputy confirmed that he observed Defendant standing either in the driveway or in the roadway just at the edge of the driveway and that he saw two "items fly through the air" from the area where Defendant stood alone into the ditch across the road.

TCSO Deputy Bryan Lavery arrived at Defendant's residence just after the SWAT team and was asked to deploy his narcotics-trained canine to the area of the ditch where the two items landed. When the canine indicated the presence of narcotics, Deputy Lavery advised other officers on the scene but did not collect the items himself.

TCSO Detective Javier Rodriguez took photographs and collected evidence during the execution of the search warrant at Defendant's residence. After Deputy Lavery told him that the canine had located items in the ditch, Detective Rodriguez photographed and collected the two plastic bags containing a white powdery substance. Detective Rodriguez also photographed and collected items from inside a shed on the property, including: "a red bag with green leafy substance in a vacuum sealed bag" and a scale. A USB flash drive containing 172 photographs and one video recording taken during the execution of the search warrant was exhibited to the detective's testimony. Detective Rodriguez testified that he obtained a key to a safe inside the residence from "either [Defendant's] sister or off a key chain" at the residence and gave it to Investigator Baylous.

Investigator Williams testified that when he arrived at the residence, the SWAT team had Defendant and his parents outside. Investigator Williams said that he did not ask Defendant any questions and that, instead, Defendant asked the investigator "if we could get his mama and his daddy back in the house" given that "it was hot outside and they are elderly." Investigator Williams told Defendant that as soon as the police were done with the search, "we'll get them back in the house as soon as we can. The quicker we find the drugs or contraband, we can get them back inside." At that point, Defendant said, "if we can get them back inside, I'll take you to them. I'll show you where they're at."

During cross-examination, Investigator Williams testified that he conducted surveillance of the three completed controlled buys that precipitated the search in this case and that on each occasion, he observed Defendant "coming from the house, from the side of the house" to the edge of the road to meet the confidential informant, who "would pull up to the residence."

9

TCSO Deputy and Evidence Technician Andrew Harrington testified that he received the items collected during the search, including "a 12 gauge semiautomatic shotgun" along with three magazines and ammunition and three bags containing white powder. Deputy Harrington sent the three bags—one weighing 80 grams, one weighing 3.6 grams, and one weighing 2.6 grams—of white powder to the Tennessee Bureau of Investigation ("TBI") for testing. Deputy Harrington also identified a scale and two boxes of "fold top baggies" collected during the search. Finally, Deputy Harrington testified that he placed the $8,022 in cash that was collected during the search into a bank account.

TBI Special Agent and Forensic Scientist Rachel Strandquist performed forensic testing on the white powdery substance discovered in a shed in Defendant's backyard and determined that it was 79.31 grams of cocaine. Testing of "white compressed powder" found in the ditch established that it was 3.39 grams of cocaine, and testing of "an off-white, rock-like substance" found in the same ditch established that it was 3.13 grams of cocaine.

Based upon this evidence, the trial court convicted Defendant of possession with intent to deliver twenty-six grams or more of cocaine and possession of drug paraphernalia. The court reserved ruling on the remaining count charging possession of a firearm with the intent to go armed during the commission of a dangerous felony and invited the parties to submit supplemental briefing and argument on the issue. After listening to supplemental arguments at the sentencing hearing, the trial court convicted Defendant of the remaining charge.

Following a sentencing hearing, the trial court imposed a Range I sentence of ten years' incarceration for Defendant's conviction of possession with intent to deliver twenty-six grams or more of cocaine, a concurrent sentence of eleven months and twenty-nine days for his conviction of possession of drug paraphernalia, and a consecutive sentence of five years to be served at 100 percent by operation of law for his conviction of possession of a firearm during the commission of a dangerous felony.

Defendant filed a timely but unsuccessful motion for new trial in which he challenged the trial court's denial of his motion to suppress and the sufficiency of the evidence supporting his conviction of possession of a firearm during the commission of a dangerous felony. This timely appeal followed.

**Analysis**

On appeal, Defendant asserts that the trial court erred by denying his motion to suppress the evidence and statements obtained during the search of the residence he shared with his parents and the sufficiency of the convicting evidence. We consider each claim in turn.

## I. Motion to Suppress

Defendant argues that the trial court should have suppressed the evidence obtained during the execution of the search warrant because the information in the warrant affidavit was insufficient to establish a nexus between the controlled buys and the residence, because the warrant failed to describe the place to be searched with constitutionally sufficient particularity, and because the warrant affidavit failed to establish the reliability of the confidential informant. The State contends that the trial court did not err by concluding that the warrant satisfied the nexus requirement and that Defendant waived plenary review of the remaining claims. We agree with the State.

### A. Standard of Review

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge as the trier of fact. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). "The party prevailing in the trial court 'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence.'" *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017) (quoting *State v. Bell*, 429 S.W.3d 524, 529 (Tenn. 2014). We review the trial court's application of the law to the facts de novo, "and the appellate court is not obliged to afford a presumption of correctness to the lower court's conclusions of law." *Id.* (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

### B. General Principles

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable, and any evidence discovered is subject to suppression. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. Conversely, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Tuttle*, 515 S.W.3d at 300 (quoting *United States v. Ventresca*, 380 U.S. 102, 106 (1965)).

To be valid, a search warrant must be issued by a neutral and detached magistrate based upon probable cause supplied by affidavit that particularly describes the person, place, or property to be searched. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7; Tenn. Code Ann. § 40-6-103; *see also* Tenn. R. Crim. P. 41(c); *State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016). "Probable cause for the issuance of a search warrant exists when, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place,' which in this instance was the defendant's residence." *State v. Aguilar*, 437 S.W.3d 889, 899 (Tenn. Crim. App. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Because the probabilities

involved "are not technical" but are, instead, "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," the determinations "are extremely fact-dependent." *Tuttle*, 515 S.W.3d at 300 (first quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949); and then *Bell*, 429 S.W.3d at 534). When "considering whether probable cause supported issuance of a search warrant," this court "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Id.* at 299 (quoting *State v. Henning*, 975 S.W.2d 290, 295 (Tenn. 1998); and then citing *State v. Jacumin*, 778 S.W.2d 430, 432 (1989)). We examine the information in the affidavit to determine whether, "as a whole," the information therein "provided the magistrate with 'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *Id.* (quoting *Jacumin*, 778 S.W.2d at 432). Given the fact-driven nature of the probable cause determination, we "afford 'great deference' to a magistrate's determination that probable cause exists." *Id.* at 300 (quoting *Jacumin*, 778 S.W.2d at 431-32; and citing *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009)).

"When the affidavit seeks to establish probable cause for a search warrant, it must 'set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched.'" *Id.* (quoting *State v. Smith*, 868 S.W.2d 561, 572 (Tenn. 1993)). "In other words, the affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id.* (citing *Saine*, 297 S.W.3d at 206). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." *Smith*, 868 S.W.2d at 572. The court may also "consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct." *Tuttle*, 515 S.W.3d at 301 (quoting *Saine*, 297 S.W.3d at 206). Notably, although the affidavit must establish a nexus between the place to be searched and the evidence to be seized, it "need not implicate a particular person in the crime under investigation." *Id.* (first citing *Zurcher v. The Stanford Daily*, 436 U.S. 547, 556 (1978); and then *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015)).

*C. The Affidavit*

Here, the affidavit established that officers had gathered information that Defendant "was conducting narcotics transactions" at his residence, that they confirmed this information by arranging four controlled drug transactions between Defendant and an "undercover agent," and that three of the transactions were completed before the application for the search warrant. The affidavit provided that on July 5, 6, and 7, 2023, the undercover agent met Defendant at the residence and that on each occasion the undercover agent exchanged cash for a white substance that field tested positive for cocaine. The affidavit also provided that officers surveilled the area both before and after each transaction, that the undercover agent was equipped to allow officers to monitor the transaction in real time, and that Investigator Williams observed each transaction. Finally,

12

the affidavit included Investigator Baylous' assertion that, given the number of transactions, it was his belief that Defendant was in possession of "a large quantity of illegal narcotics" and that he "has been known to hide large quantities of narcotics, proceeds from narcotics transactions and/or other evidence throughout his property in locations not commonly located or accessed by law enforcement."

Although Defendant cites *State v. Nightwine* in support of his claim that the nexus requirement was not met, as the trial court correctly concluded, that case is easily distinguishable from this one. First, and perhaps most important given our standard of review, the trial court *granted* the motion to suppress in *Nightwine* after concluding that the State had failed to establish a nexus requirement. *State v. Nightwine*, No. M2013-00609-CCA-R3CD, 2013 WL 6669393, at *3 (Tenn. Crim. App. Dec. 17, 2013). This distinction is important because, on appeal, we "afford 'great deference' to a magistrate's determination." *Tuttle*, 515 S.W.3d at 300 (quoting *Jacumin*, 778 S.W.2d at 431-32; and citing *Saine*, 297 S.W.3d at 207). Second, unlike the affidavit in this case, which states that each of the controlled buys took place at Defendant's residence, the affidavit in *Nightwine* listed two separate addresses where controlled purchases took place and did not state "that the sales took place at Mr. Nightwine's residence located at 115 Emory Street. Rather, the affidavit asserts only that the sales took place 'at 115 Emory Street' without any further specificity as to the location of the sales or reference to the residence." *Nightwine*, 2013 WL 6669393, at *6 (Tenn. Crim. App. Dec. 17, 2013). Third, unlike the officers in this case, who "observe[d] and live time monitor[ed]" each transaction via recording equipment and surveillance at the same location, the officers in *Nightwine* "listened to" transactions that took place at two different locations. *Id.*, at *1-2. Fourth, unlike the transactions in this case, which took place within days of each other and involved a single confidential informant, the four transactions in *Nightwine* took place over the course of five months and involved at least two different undercover purchasers. *Id.*

In our view, the information in the affidavit was sufficient to establish probable cause and, specifically, to satisfy the nexus requirement. The affidavit need not contain "definite proof that the seller keeps his supply at his residence," instead, the nexus requirement is met "if there are some additional facts, (such as that . . . the seller or buyer went to his home prior to the sale or after the sale . . .) which would support the inference that the supply is probably located there." *See Saine*, 297 S.W.3d at 206 (quoting 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(d) (4th ed. 2004 & Supp. 2008-09)). The affidavit in this case supplies just that. Throughout the affidavit, the place to be searched is referred to as Defendant's residence, and the affidavit provided that successive controlled buys between the confidential informant and Defendant were completed at that residence only days before the warrant was issued. *Id.* (finding that warrant met the nexus requirement even though "[t]he affidavit did not state, for example, that criminal activity occurred at Mr. Saine's residence or that the fruits of the search were observed there"). The affidavit also contained information about Investigator Baylous' experience in law enforcement and his statement that, "based on his knowledge, training

13

and experience," he believed that evidence of Defendant's possession of "Schedule II narcotics with the intent to manufacture, sell and/or deliver will be located at the residence."

In three related issues, Defendant contends that the warrant failed to particularly describe the place to be searched or the evidence to be seized, that the scope of the search was too broad, and that the knowledge base for the confidential informant was insufficient to establish that the informant was reliable. The State asserts that Defendant has waived our consideration of these claims because he raises them for the first time on appeal. We agree with the State.

Defendant insists in his reply brief that these new challenges are merely "additional reasons" supporting his argument that the affidavit failed to establish probable cause. Although it is true that all these factors are part of the overall probable cause determination, they are separate issues that require distinct inquiries. Here, Defendant specifically asserted in the trial court that "[t]here is not a sufficient nexus between the location where the alleged undercover purchases occurred and the place to be searched." Yet a "motion to suppress, like any other motion, is required to state the grounds upon which it is predicated with particularity." *State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988) (citing Tenn. R. Crim. P. 47). The failure to include an issue in a motion to suppress results in waiver of that issue. *State v. Stanhope*, 476 S.W.3d 382, 396 (Tenn. Crim. App. 2013) (concluding that the defendant waived issue of whether officers violated his privilege against self-incrimination by asking for consent to submit to gunshot residue testing because he failed to include that issue in his motion to suppress the statements he provided to police (first citing Tenn. R. Crim. P. 12(f)(1); and then *State v. Burtis*, 664 S.W.2d 305, 310 (Tenn. Crim. App. 1983)).

Furthermore, Defendant failed to include these "additional" theories in his motion for new trial. "In a motion for new trial, the defendant must set forth the factual grounds on which he relies, the legal grounds for the trial court's ruling, and a concise statement as to why the trial court's decision was in error." *Id.* (quoting *State v. Harbison*, 539 S.W.3d 149, 164-65 (Tenn. 2018)). When crafting argument in a motion for new trial, a defendant should not "simply allege, in general terms, that the trial court committed error, either by taking some action or by admitting or excluding evidence" but should "identify the specific circumstances giving rise to the alleged error so that it may be reasonably identified in the context of the entire trial." *Fahey v. Eldridge*, 46 S.W.3d 138, 142-43 (Tenn. 2001) (citing *State v. Ashburn,* 914 S.W.2d 108, 114 (Tenn. Crim. App. 1995)). "Grounds not raised in a motion for new trial are waived for purposes of appeal." *Harbison*, 539 S.W.3d at 164.

Because Defendant did not include these specific issues in either his motion to suppress or motion for new trial, they are waived. Defendant has not asked this court to review the issue for plain error, and, accordingly, we decline to do so. The first and best way to obtain plain error review is to ask for it. *See State v. Thompson*, No. W2022-01535-

CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Because the '[d]efendant bears the burden of persuasion to show that he is entitled to plain error relief,' a defendant's failure to request this relief weighs against any such consideration on our own." (first quoting *State v. Dixon,* No. M2021-01326-CCA-R3-CD, 2022 WL 5239289, at *21 (Tenn. Crim. App. Oct. 6, 2022); and then citing *State v. Cornwell,* No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012))) (alteration in *Thompson*).

In sum, under our deferential standard of review, we conclude the trial court did not err by denying Defendant's motion to suppress.

### D. Fruit of the Poisonous Tree

Defendant claims that the trial court should have suppressed the statements he provided to the police directing them to the drugs stashed at his residence as fruit of the illegal search of his property. We note that although Defendant's suppression motion stated in conclusory fashion that "[a]ll evidence seized and statements made are fruit of the poisonous tree and must be suppressed," he did not specifically argue that the statements he made to law enforcement were the fruit of what he claimed was an illegal search. Additionally, Defendant did not raise this argument in the hearing on the motion to suppress or in his motion for new trial. Accordingly, it is waived. Moreover, because we have concluded that the warrant was valid and the search legal, Defendant is not entitled to relief on this issue.

### E. Miranda

Defendant asserts that the trial court should have suppressed the statements that he gave to law enforcement because they were given during a custodial interrogation without the benefit of *Miranda* warnings. The State concedes that Defendant was in custody when he made the statements and that he was not provided with *Miranda* warnings but argues that the statements were spontaneous and not made in response to interrogation. The State also argues, in the alternative, that the admission of the statements was harmless.

Both the state and federal constitutions provide all persons with a privilege against compulsory self-incrimination. U.S. Const. amend. V ("[N]o person . . . shall be compelled in any criminal case to be a witness against himself."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.") In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To safeguard the privilege against self-incrimination,

15

"[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* *Miranda* warnings are required only "when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent." *State v. Moran*, 621 S.W.3d 249, 257 (Tenn. Crim. App. 2020) (citing *Walton*, 41 S.W.3d at 83).

The parties agree and the trial court concluded that Defendant was in custody when he interacted with Investigators Williams and Baylous. Although we need not accept the parties' agreement, it is our view that the evidence supports the conclusion that Defendant was in custody. He was handcuffed by members of the SWAT team just before officers started executing the search warrant and remained handcuffed and under the watchful eye of other officers throughout the search. *See Miranda*, 384 U.S. at 444. We turn next to the question whether Defendant was subjected to interrogation. *See id.* at 478 ("The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.").

"'Interrogation' for purposes of *Miranda* includes 'express questioning or its functional equivalent.'" *State v. Northern*, 262 S.W.3d 741, 750 (Tenn. 2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The Supreme Court defined the "functional equivalent" of express questioning as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted); *see also Northern*, 262 S.W.3d. at 750. The determination whether the defendant has been subjected to the functional equivalent of interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," but recognizing that "the police surely cannot be held accountable for the unforeseeable results of their words or actions," the Court held that "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301-02 (footnotes omitted). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478.

Here, Investigator Williams' accredited testimony established that he spoke to Defendant while the search was ongoing but did not ask him any direct questions. During their interaction, which began with small talk between the two, Defendant asked if they could accelerate the search so that his elderly parents could go back inside the house. Investigator Williams told Defendant that he knew that the officers were there to execute a search warrant and that he would be glad to "speed up the process." Investigator Williams told Defendant that as soon as the police were done with the search, "we'll get them back in the house as soon as we can. The quicker we find the drugs or contraband, we can get

them back inside." Defendant then said that he would "show [officers] where everything is if we can get my mama and daddy back in the house out of the weather." Investigator Williams insisted that he did not promise to allow Defendant's parents to go back inside in exchange for Defendant's directing them to the drugs. Investigator Baylous' questioning of Defendant was confined to his confirming what Defendant had said to Investigator Williams. The trial court concluded that the officers' interaction with Defendant was not the functional equivalent of interrogation. We agree.

Defendant, and not the officers, was the first to inquire about speeding up the search process so that his parents could go back inside. *Cf. State v. Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *4 (Tenn. Crim. App. June 7, 2017) (holding that defendant had been subjected to the "functional equivalent" of interrogation when "the defendant in this case did not engage the officer in conversation regarding his case; the officer engaged the defendant in conversation, and this conversation went beyond simply asking for the personal information needed to facilitate the arrest"); *State v. Brown*, No. M2013-02327-CCA-R3-CD, 2015 WL 445542, at *12 (Tenn. Crim. App. Feb. 3, 2015) (concluding that "asking a suspect why he was at a particular location when investigating an attempted aggravated burglary is a question that a police officer should have known was reasonably likely to elicit an incriminating response"). In response, Investigator Williams told Defendant that the investigator knew why the other officers were there and that the more quickly they discovered contraband, the more quickly Defendant's parents would be allowed to go back inside. Defendant then told Investigator Williams he would direct them to the drugs. Investigator Baylous' only question to Defendant was posed to confirm the earlier statement. Even if Investigator Williams' telling Defendant that his parents would be allowed inside as soon as officers found what they were looking for could be seen as "reasonably likely to elicit an incriminating response from the defendant," it could not be deemed a "psychological ploy[]" of the type that "amount[s] to interrogation." *Northern*, 262 S.W.3d at 753 (first quoting *Innis*, 446 U.S. at 299; and then citing *Miranda*, 384 U.S. at 450). Additionally, "the record reflects that the police were 'engaged in activity calculated to produce evidence against the defendant by other means'" when the conversation took place between Defendant and Investigator Williams. *State v. Maraschiello*, 88 S.W.3d 586, 603 (Tenn. Crim. App. 2000) (citation omitted). We conclude that the record does not establish that Defendant was interrogated and, consequently, *Miranda* warnings were not required.

Furthermore, the sole remedy for a *Miranda* violation is the suppression of any *statements* made during a custodial interrogation. *See State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *United States v. Patane,* 542 U.S. 630, 642-43 (2004)). A *Miranda* violation "does not categorically prohibit the government from using nontestimonial evidence derived from such statements." *State v. Washington*, No. W2022-01201-SC-R11-CD, 2025 WL 2847585, at *6 (Tenn. Oct. 8, 2025) (citing *Climer*, 400 S.W.3d at 567), *petition for cert. filed*, (U.S. Jan. 5, 2026) (No. 25-6564). Suppression of physical evidence, even if it could be considered as "fruits" of the *Miranda* violation, is not required.

*Climer*, 400 S.W.3d at 567. "The Fifth Amendment's privilege against self-incrimination is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id*. Instead, courts need not suppress physical evidence "discovered as a result of a statement elicited in violation of *Miranda*" unless the statements were obtained through "actual coercion in obtaining the statement . . . or when the invocation of the right to remain silent or to have counsel present is not scrupulously honored." *Id.* (quoting *Walton*, 41 S.W.3d at 92). "When a defendant's will is overcome so that the statement is a 'product of coercion,' the statement is not voluntary, and it would violate the Self-Incrimination Clause to use the statement or any resulting evidence in a criminal trial." *Washington*, 2025 WL 2847585, at *6 (quoting *Climer*, 400 S.W.3d at 567-68). Because Defendant does not argue that his statements were not voluntary, their exclusion would not lead to the exclusion of the drugs that he led the officers to discover.

Although Defendant does not specify which statements he wanted suppressed, the only statements of Defendant admitted at trial were those indicating he would show the officers where the drugs were located. Even if we had concluded that these statements should have been suppressed, we would have no trouble concluding that their admission was harmless beyond a reasonable doubt considering the other overwhelming evidence of Defendant's guilt. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (applying constitutional harmless error analysis to erroneous admission of confession); *see also State v. Koffman*, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006); *State v. Dean*, 76 S.W.3d 352, 371 (Tenn. Crim. App. 2001).

## II. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence, arguing that the State failed to establish that he knowingly possessed the cocaine, drug paraphernalia, and firearm seized during the search of his residence. The State asserts that the evidence was sufficient to support each of Defendant's convictions. We agree with the State.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We must decline any invitation to revisit witness credibility or any purported discrepancies in the evidence because the factfinder, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

### *A. Conviction Offenses*

#### 1. Possession of Cocaine with Intent to Deliver

Defendant was convicted of possession with intent to deliver 26 grams or more of cocaine. "It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . deliver . . . the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). Cocaine is a controlled substance. *See id.* § 39-17-408(b)(4). The trier of fact may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." *Id.* § 39-17-419. "Other relevant facts" include the weight and street value of the drugs, the packaging of the drugs, the presence of a large amount of cash, and the presence of weapons. *See, e.g.*, *State v. Nelson*, 275 S.W.3d 851, 867 (Tenn. Crim. App. 2008); *State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995); *State v. Matthews*, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990). When, as here, an "accused is not in exclusive possession of the place where the controlled substance is found, additional incriminating facts and circumstances must be presented" that "affirmatively link the accused to the controlled substance." *Id.* These include:

> (1) whether the drugs were in plain view[;] (2) whether contraband was in close proximity to the defendant[;] (3) conduct on the part of the defendant indicative of guilt, including furtive gestures and flight; (4) the quantity of drugs present; (5) the proximity of the defendant's effects to the contraband; (6) the presence of drug paraphernalia; (7) whether the defendant was under the influence of or possessed additional narcotics; (8) the defendant's relationship to the premises; and (9) incriminating statements made by the defendant.

*State v. Richards*, 286 S.W.3d 873, 885-6 (Tenn. 2009) (footnotes omitted).

19

## 2. Possession of a Firearm

Defendant was also convicted of possession of a firearm with the intent to go armed during the commission of a dangerous felony after having been previously convicted of a dangerous felony. Code section 39-17-1324 provides that "[i]t is an offense to possess a firearm or antique firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(a). Possession with intent to deliver cocaine is listed as a dangerous felony. *Id.* § 39-17-1324(i)(1)(AA). The statute provides for enhanced penalties "if the defendant, at the time of the offense, had a prior felony conviction," which "means that the person serves and is released or discharged from, or is serving, a separate period of incarceration or supervision for the commission of a dangerous felony prior to or at the time of committing a dangerous felony on or after January 1, 2008." *Id.* § 39-17-1324(g)(2).

## 3. Possession of Drug Paraphernalia

Finally, Defendant was convicted of possession of drug paraphernalia. Tenn. Code Ann. § 39-17-425(a)(1). The Code defines drug paraphernalia as the "equipment, products and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body, a controlled substance." *Id.* § 39-17-402(12). When determining "whether a particular object is drug paraphernalia," the trier of fact "shall, in addition to all other logically relevant factors, consider":

(1) Statements by the owner or anyone in control of the object concerning its use;

(2) Prior convictions, if any, of the owner or of anyone in control of the object for violation of any state or federal law relating to controlled substances or controlled substance analogues;

(3) The existence of any residue of controlled substances or controlled substance analogues on the object;

(4) Instructions, oral or written, provided with the object concerning its use;

(5) Descriptive materials accompanying the object that explain or depict its use;

(6) The manner in which the object is displayed for sale;

(7) The existence and scope of legitimate uses for the object in the community; and

(8) Expert testimony concerning its use.

*Id.* § 39-17-424.

## B. Possession Generally

Defendant stands convicted of three possession offenses. Tennessee courts recognize that possession may be either actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses a controlled substance when he or she has "the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others." *Id.* at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). In other words, constructive possession is the "ability to reduce an object to actual possession." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]he mere presence of a person in an area where [contraband is] discovered is not, alone, sufficient." *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing *Cooper*, 736 S.W.2d at 129). "Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." *Cooper*, 736 S.W.2d at 129. "Possession need not be exclusive and may be exercised jointly with more than one person." *Richards*, 286 S.W.3d at 885 (citations omitted).

## C. Evidence in this Case

Here, the evidence established that Investigator Baylous learned that Defendant had been selling drugs out of his residence. To confirm his suspicions, Investigator Baylous contacted a confidential informant who then arranged to purchase cocaine from Defendant on three occasions. Defendant chose his residence to be the location for each transaction, and all three transactions took place within a week prior to the execution of the search warrant. Investigator Williams observed each transaction and saw Defendant coming from the side of the house to deliver the drugs to the confidential informant, who sat in a vehicle parked at the end of the driveway. When officers went to execute the search warrant at Defendant's residence, Defendant was standing at the end of the driveway. Deputy Wallace saw Defendant throw two items that turned out to be baggies containing cocaine across the road and into the ditch. While executing the warrant, officers found a firearm and a set of scales in a bedroom that also contained copies of Defendant's driver's license and social security card, mail bearing Defendant's name, and clothing and shoes consistent with a man of Defendant's size. A safe in the room contained $8,022. A shed on the property contained more than eighty grams of cocaine and baggies.

In our view, the seizure of more than eighty grams of cocaine, scales, baggies, a loaded gun, and a large amount of cash from the residence Defendant shared with his

elderly parents, particularly when coupled with Defendant's recent drug sales at the residence to a confidential informant on three separate occasions and his leading officers directly to some of the seized drugs, was sufficient to support all his convictions. Although Defendant suggests that we should exclude his statements that he would show officers to the drugs from our analysis of the sufficiency of the evidence, the law is clear that "we evaluate the sufficiency of the evidence in light of all of the evidence presented to the jury, including the improperly admitted evidence." *State v. McLawhorn*, 636 S.W.3d 210, 237 (Tenn. Crim. App. 2020) (first citing *State v. Longstreet*, 619 S.W.2d 97, 99-101 (Tenn. 1981); and then *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008)). Even if Defendant did not have exclusive control over any of these items, he certainly had "the ability to reduce [these items] to actual possession." *Cooper*, 736 S.W.2d at 129. Clearly, the evidence established that Defendant had the ability to reduce the drugs to actual possession given that he did so during each controlled buy and when he threw two baggies of cocaine across the road in full view of Deputy Wallace. As to the firearm, "the State was not required to prove that the Defendant wielded or used the weapon for the jury to find all of the necessary elements of possession of a firearm with the intent to go armed during the commission of a dangerous felony." *State v. Watkins*, No. W2020-01006-CCA-R3-CD, 2021 WL 5919119, at *7 (Tenn. Crim. App. Dec. 15, 2021) (citations omitted). In our view, it was enough that the firearm was found in Defendant's bedroom among Defendant's other possessions. Furthermore, the discovery of all these items together supports the inference that Defendant possessed the cocaine with intent to deliver it.

## Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.


                s/ Matthew J. Wilson
                MATTHEW J. WILSON, JUDGE